NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 20, 2022

S21G1281. BUCKNER-WEBB et al. v. THE STATE

LAGRUA, Justice.

We granted certiorari in this case to determine whether a trial court's order denying a motion to withdraw as counsel based on alleged conflicts of interest is immediately appealable under the collateral order doctrine. For the reasons that follow, we conclude that such orders do not fall within "the very small class" of trial court orders that are appealable under that doctrine, *Duke v. State*, 306 Ga. 171, 172 (1) (829 SE2d 348) (2019), and thus we affirm the Court of Appeals' decision in *Buckner-Webb v. State*, 360 Ga. App. 329 (861 SE2d 181) (2021), albeit for different reasons.

I.    *Pertinent Facts and Procedural History*

In March 2013, Diane Buckner-Webb, Theresia Copeland, Sharon Davis-Williams, Tabeeka Jordan, Michael Pitts, and Shani Robinson (collectively, "Defendants") were indicted by a Fulton County grand jury, along with 35 other educators and administrators of the Atlanta Public Schools ("APS"), for conspiracy to violate the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, OCGA § 16-14-1 et seq., and other crimes, arising out of their alleged participation in a conspiracy to alter students' standardized test scores. Of the 35 indicted, 12 APS employees, including Defendants, were tried together between August 2014 and April 2015. In April 2015, the jury found Defendants and five others guilty of at least one count of conspiracy to violate the RICO Act.

In April and May 2015, Defendants filed timely motions for new trial through their respective trial attorneys. The trial transcripts were filed into the record between June 2015 and October 2016. Thereafter, despite the fact that each Defendant was

2

represented by a separate attorney at trial, the Circuit Public Defender appointed only one attorney, Stephen R. Scarborough, to jointly represent Defendants as appellate counsel, and he formally entered an appearance on Defendants' behalf on April 26, 2017.

The trial court held a status hearing on Defendants' motions for new trial in December 2018. Following the status hearing, Defendants were given six months to file particularized motions for new trial, and the State was given six months to respond.

On June 28, 2019, more than two years after Scarborough's appointment as appellate counsel for Defendants and around the time Defendants' particularized motions for new trial were due for filing, Scarborough filed a "Motion for Rule 1.7[1] Determinations" to

---

[1] Rule 1.7 of the Georgia Rules of Professional Conduct ("GRPC") found in Bar Rule 4-102 provides:
    (a) A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client, except as permitted in (b).
    (b) If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client gives

address alleged conflicts of interest arising from his joint representation of Defendants. Scarborough also filed a motion to withdraw as counsel based upon this conflict of interest. The trial court heard the motion to withdraw on August 8, 2019.[2]

informed consent, confirmed in writing, to the representation after:

(1) consultation with the lawyer, pursuant to Rule 1.0 (c);

(2) having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation; and

(3) having been given the opportunity to consult with independent counsel.

(c) Client informed consent is not permissible if the representation:

(1) is prohibited by law or these Rules;

(2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or

(3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients.

(d) Though otherwise subject to the provisions of this Rule, a part-time prosecutor who engages in the private practice of law may represent a private client adverse to the state or other political subdivision that the lawyer represents as a part-time prosecutor, except with regard to matters for which the part-time prosecutor had or has prosecutorial authority or responsibility.

The maximum penalty for a violation of this Rule is disbarment.

[2] At the outset of the hearing, the trial court inquired into the more than two-year delay in Scarborough's filing of the motion to withdraw after his appointment as counsel. Scarborough responded that the "regrettable" delay was unavoidable because of the time he needed to review the voluminous record adequately. He also explained that, while he initially believed that joint representation was "the best and most efficient way to handle this," he later

In support of his request to withdraw as counsel, Scarborough asserted that: (1) he was in "an ethically untenable position" because his loyalty to each Defendant would require him to omit issues and claims he would otherwise raise in the motions for new trial or, at the very least, to argue those issues "less robustly" than he otherwise would; (2) he had an actual conflict under Rule 1.7 because his duties to each Defendant would materially and adversely affect his performance and legal representation of the others; (3) as required by Rule 1.7, he met separately with Defendants and advised them of the conflict, and Defendants declined to waive the conflict and requested the appointment of

recognized that he had to make this motion under Rule 1.7—irrespective of the passage of time—because (1) his representation of Defendants was conflicted; (2) Defendants would not waive the conflict; and (3) he could be subject to professional discipline if he continued to jointly represent Defendants despite this conflict. Scarborough acknowledged that "everybody with a law degree that's involved with this case must have seen that this was a potential problem," but reiterated this awareness was no "substitute for reading the record and performing as counsel." Although the trial court expressed frustration in the time it took Scarborough to raise the conflict issue, particularly given the publicity surrounding the trial and the well-known fact that Defendants "represent three levels of authority within APS," the trial court nevertheless allowed the motion hearing to proceed.

5

conflict-free appellate counsel; and (4) he contacted the General Counsel's Office at the State Bar of Georgia and, after describing the circumstances, was advised that he could not continue representing Defendants in this case.

In response to Scarborough's assertions, the State argued that there was no conflict of interest in Scarborough's representation of Defendants on appeal. In furtherance thereof, the State asserted that Scarborough did not provide any specificity as to the purported conflict of interest and that any purported conflict of interest was merely an "erroneous assumption," unsupported by case law, and inapplicable in a RICO conspiracy case where all of the evidence presented was relevant to all Defendants. After hearing additional argument from both sides, the trial court conducted an ex parte conference in chambers for Scarborough to detail the exact nature of the conflict of interest, which Scarborough noted he could only do "to a degree."[3]

---

[3] During the ex parte conference, Scarborough emphasized to the trial court that he could not go into the specific conflicts regarding each client

Following the ex parte conference, the trial court resumed the hearing in open court and denied the motion to withdraw, stating that, after "a private session with the public defender where the public defender laid out what they term specifics about conflict," the court "did not find the conflict specific enough for anybody in this case." However, the trial court advised the parties that it would like to "expedite the Appeals Court to look at this" and indicated it would issue a certificate of immediate review to "ask [the Court of Appeals] to take this issue up."[4] On August 21, 2019, the trial court entered

because talking about one client would violate his duty of loyalty to another client. He also explained that due to the nature of his clients' employment positions within APS (representing a hierarchy of high- to low-ranking employees), he could not raise certain issues in arguing the motion for new trial, as the issues would benefit one client at the expense of the others.

[4] Of note, during the ex parte conference, the trial court had inquired of Scarborough and the other conflict public defenders present whether the Circuit Public Defender appointed only one attorney to represent Defendants "in an effort to save money" and, if so, where the Public Defender was "going to get the money" to hire and appoint "private conflict" counsel for the six Defendants. Scarborough and the other attorneys present expressed their inability to respond, stating it was "above [their] pay grade." At the close of the public hearing, the trial court asked Scarborough for "a detailed report on the indigency" of each Defendant and "exactly what information they gave [Scarborough] to be declared indigent for [him] to represent them." Scarborough stated that Defendants "have completed that process" and "have been determined to be indigent," to which the trial court responded, "I would like all the information that was the basis of that, because, if this happens, it

a written order denying the motion to withdraw, stating simply that "[f]or the reasons stated at the [August 8, 2019] hearing, the motion is hereby denied." On the same date, the trial court issued a certificate of immediate review under OCGA § 5-6-34 (b).[5]

Defendants filed an application for interlocutory review in the Court of Appeals on September 3, 2019, seeking permission to appeal the trial court's order denying the motion to withdraw under OCGA § 5-6-34 (b). Before the Court of Appeals ruled on Defendants'

_____

is going to cost a million dollars for the State to fund new representation for all these people[,]" and "they have a duty to show under oath that they are indigent." The State then asked when Defendants completed the process, to which Scarborough responded, "It is not within the State's purview to inquire about their eligibility." The trial court emphasized that it wanted "somebody to inquire about it other than [Scarborough] just making the statement," explaining that "[i]f [the Court of Appeals] agree[s] with you, then the thing has to start over, and there needs to be a detailed financial record of assets for [Defendants] and tax returns."

[5] Under OCGA § 5-6-34 (b),
> [w]here the trial judge in rendering an order, decision, or judgment, not otherwise subject to direct appeal, including but not limited to the denial of a defendant's motion to recuse in a criminal case, certifies within ten days of entry thereof that the order, decision, or judgment is of such importance to the case that immediate review should be had, the Supreme Court or the Court of Appeals may thereupon, in their respective discretions, permit an appeal to be taken from the order, decision, or judgment if application is made thereto within ten days after such certificate is granted.

8

application, Defendants also filed a direct appeal of the trial court's order on September 20, 2019, asserting that the order was directly appealable under the collateral order doctrine.

The Court of Appeals denied Defendants' application for interlocutory review on September 25, 2019.[6] On June 29, 2021, in a split decision issued by the whole court, the Court of Appeals also dismissed Defendants' direct appeal for lack of jurisdiction, concluding that the collateral order doctrine did not apply to the trial court's order denying the motion to withdraw as counsel. See *Buckner-Webb*, 360 Ga. App. at 331. Defendants then filed a second petition for a writ of certiorari in this Court, which we granted on December 14, 2021, to decide the first-impression legal question set forth above.

---

[6] On November 11, 2019, Defendants filed their first petition for certiorari in this Court, seeking review of the Court of Appeals' denial of their application for interlocutory review. We denied the petition for certiorari on May 18, 2020.

II.  *Analysis*

(a)  *Legal Backdrop*

Our General Assembly has established a statutory framework governing appeals in Georgia.  See *Rivera v. Washington*, 298 Ga. 770, 780 (784 SE2d 775) (2016).  See also OCGA § 5-6-34.

> OCGA § 5-6-34 governs what trial court orders may be reviewed immediately by an appellate court.  Specifically, subsection (a) of the statute lists the trial court judgments and orders that may be appealed immediately. This list includes all final judgments where the case is no longer pending in the court below [except as provided in OCGA § 5-6-35].

*Duke,* 306 Ga. at 172 (1).  This list also includes "specific types of trial court rulings that the General Assembly has deemed important enough to the case, or dispositive enough of the case, to warrant an immediate appeal, even though such rulings are often interlocutory rather than final judgments." *Rivera,* 298 Ga. at 773 (citing OCGA § 5-6-34 (a) (2)-(13)).  See also *In re Paul*, 270 Ga. 680, 682 (513 SE2d 219) (1999) (OCGA § 5-6-34 (a) (2)-(13) allows direct appeals of "judgments or orders that may have an irreparable effect on the

10

rights of the parties, such as rulings in contempt, injunctions, and mandamus actions[.]").

> Other cases can be appealed immediately only with permission from both the trial court and the appellate court. OCGA § 5-6-34 (b). When a trial court enters an order, decision, or judgment not otherwise subject to immediate appeal under OCGA § 5-6-34 (a), appeal from that order may be had only where the trial judge certifies within ten days of entry thereof that the order, decision, or judgment is of such importance to the case that immediate review should be had. Upon such certification, the Supreme Court or the Court of Appeals may thereupon, in their respective discretions, permit an appeal to be taken from the order, decision or judgment.

*Duke*, 306 Ga. at 172 (1) (citing OCGA § 5-6-34 (b)) (punctuation omitted). Accordingly, as a general rule, when a party seeks to appeal a non-final order issued by a trial court before the case is fully adjudicated below, Georgia courts require adherence to the interlocutory procedures of OCGA § 5-6-34 (b) for appellate review. See *Rivera*, 298 Ga. at 780.

Although the framework for appellate review has been statutorily mandated by the General Assembly, our appellate courts

have nonetheless created an exception by allowing immediate

appeals of

> a very small class of interlocutory rulings [that] are
> effectively final in that they finally determine claims of
> right separable from, and collateral to, rights asserted in
> the action, too important to be denied review and too
> independent of the cause itself to require that appellate
> consideration be deferred until the whole case is
> adjudicated.

*Duke*, 306 Ga. at 172-173 (1) (citation and punctuation omitted). To

qualify for immediate appeal under this "collateral order doctrine,"[7]

an interlocutory order must be "effectively final"—a status we assess

by examining whether the order "resolves an issue that is

---

[7] This legal doctrine has its origins in federal law. See *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (69 SCt 1221, 93 LE 1528) (1949) (establishing the concept of an appealable "collateral order"—an interlocutory order that falls "in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated"). See also *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (II) (A) (130 SCt 599, 175 LEd2d 458) (2009) (citing *Cohen*, 337 U.S. at 546, and holding that this legal doctrine applies to the "small class of collateral rulings that, although they do not end the litigation, are appropriately deemed final").

12

substantially separate from the basic issues to be decided at trial;" would "result in the loss of an important right if review had to await final judgment;" and "completely and conclusively decides the issue on appeal such that nothing in the underlying action can affect it." Id. at 172, 174 (1) (citation and punctuation omitted). See also *Settendown Public Utility, LLC v. Waterscape Utility, LLC*, 324 Ga. App. 652, 656 (751 SE2d 463) (2013) ("In determining whether a matter is subject to effective appellate review, we ask whether the relief sought would be barred by the entry of final judgment in the trial court."). As part of this review, we evaluate the entire class to which the claim belongs to determine whether this category of claims is potentially appealable under the collateral order doctrine. See *Roberts v. State*, 309 Ga. 639, 640 (1) (847 SE2d 541) (2020). See also *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (II) (A) (130 SCt 599, 175 LEd2d 458) (2009) (holding that, to determine the applicability of the collateral order doctrine, the inquiry should focus on "the entire category to which a claim belongs"). For example, in

13

*Roberts*, we asked whether "the denial of a statutory double jeopardy claim is appealable under the collateral order doctrine," ultimately concluding that an order denying such a claim is appealable under this legal doctrine. *Roberts*, 309 Ga. at 640-641 (1).

We have also allowed review of appeals under the collateral order doctrine when, for example, the order at issue permitted the State to involuntarily medicate a defendant to render him competent for trial or compelled a non-party newspaper reporter to disclose information regarding his confidential sources in a murder case.[8] But we have also concluded that certain interlocutory orders—including an order denying a motion to dismiss based on a defense of sovereign or quasi-judicial immunity and an order denying the State's motion to recuse a trial judge, among others—

---

[8] See, e.g., *Warren v. State*, 297 Ga. 810, 811 n.2 (778 SE2d 749) (2015) (holding that a pretrial order granting the State's motion requesting authority to involuntarily medicate a defendant in an attempt to make him mentally competent to stand trial was appealable under the collateral order doctrine); *In re Paul*, 270 Ga. at 683 (determining that an immediate appeal of a trial court's order denying the statutory reporter's privilege, see former OCGA § 24-9-30, was authorized under the collateral order doctrine).

14

did not meet the requirements of the collateral order doctrine, and thus, we did not undertake review in those cases.[9]

(b) *Application*

In the present case, the Court of Appeals majority concluded that the interlocutory order here—an order denying counsel's motion to withdraw based on an alleged conflict of interest—was not immediately appealable under the collateral order doctrine because "[Defendants] would not lose an important right" by "waiting until

---

[9] See, e.g., *Duke*, 306 Ga. at 174 (1) (holding that the collateral order doctrine did not apply to an order denying a criminal defendant's request for public funding for expert witnesses and investigators to aid his defense); *Rivera*, 298 Ga. at 773, 777 (holding that the collateral order doctrine did not apply to an order denying a motion to dismiss based on a defense of sovereign or quasi-judicial immunity); *State v. Cash*, 298 Ga. 90, 93 (1) (b) (779 SE2d 603) (2015) (holding that the collateral order doctrine did not apply to an order denying the State's motion to recuse the trial judge); *Sosniak v. State*, 292 Ga. 35, 40 (2) (734 SE2d 362) (2012) (holding that the collateral order doctrine did not apply to an order denying a pretrial motion for a constitutional speedy trial); *Crane v. State*, 281 Ga. 635, 635 (641 SE2d 795) (2007) (holding that the collateral order doctrine did not apply to an order denying a motion to dismiss the indictment pursuant to OCGA § 16-3-24.2); *Thomas v. State*, 276 Ga. 853, 853 (583 SE2d 848) (2003) (holding that the collateral order doctrine did not apply to an order denying a motion for discharge and acquittal based upon an alleged failure by the State to comply with Article IV (e) of the Interstate Agreement on Detainers, OCGA § 42-6-20); *Turner v. Giles*, 264 Ga. 812, 812-813 (450 SE2d 421) (1994) (holding that the collateral order doctrine did not apply to the pretrial denial of a claim of qualified immunity).

the proper time for a direct appeal." *Buckner-Webb*, 360 Ga. App. at 329, 330. We agree with that aspect of the Court of Appeals' analysis and conclusion.

However, the Court of Appeals majority opinion considered this question only with respect to *Defendants'* interest[10] in being represented by conflict-free counsel.[11] See *Buckner-Webb*, 360 Ga. App. at 330. The Court of Appeals was also presented with—but declined to consider—whether *counsel's* interest in avoiding a potential ethical conflict that could violate a client's constitutional rights warrants collateral-order review[12]—an issue we now consider on certiorari review. We conclude that, even considering counsel's

---

[10] Our appellate courts, like the federal courts, have used the terms "right" and "interest" at different times in considering the application of the collateral order doctrine. See, e.g., *Scroggins v. Edmondson*, 250 Ga. 430, 431-432 (1) (c) (297 SE2d 469) (1982); *Murphy v. Murphy*, 322 Ga. App. 829, 832 (747 SE2d 21) (2013); *Richardson-Merrell v. Koller,* 472 U.S. 424, 434-435 (II) (A), (105 SCt 2757, 86 LEd2d 340) (1985); *Cohen*, 337 U.S. at 546.

[11] See *Garland v. State*, 283 Ga. 201, 203 (657 SE2d 842) (2008) (holding that a criminal defendant is "entitled to representation on appeal by effective, i.e., conflict-free, counsel as a matter of constitutional law").

[12] The dissent, however, did consider this issue and concluded that counsel's interest justified application of the collateral order doctrine. See id. at 335-336 (McFadden, J., dissenting).

16

interest in this case, this category of orders—i.e., orders denying a counsel's motion to withdraw based on a conflict of interest—is not among the "very small class" of interlocutory rulings that can bypass the ordinary statutory procedures for appellate review. *Duke*, 306 Ga. at 172 (1).

We reach this conclusion because orders denying a counsel's motion to withdraw based on an alleged conflict of interest are not "effectively final," even as to counsel's interest, in the sense needed to justify application of the collateral order doctrine. *Duke*, 306 Ga. at 172 (1). Indeed, counsel will still have ways to obtain review of the interest at issue in such orders—that is, counsel's interest in avoiding a potential ethical violation arising from conflicted representation. See *Johnson & Johnson v. Kaufman*, 226 Ga. App. 77, 82 (485 SE2d 525) (1997) (concluding that there are other means of obtaining direct appellate review, including being held in contempt, when an order is not "directly appealable" under the collateral order doctrine). See also *Mohawk Indus., Inc.*, 558 U.S. at

17

107 (II) (A) (holding that if this "class of claims, taken as a whole, can be adequately vindicated by other means," the collateral order doctrine will not apply).

First, an attorney who is denied permission to withdraw as counsel based upon an alleged conflict of interest can seek to immediately appeal that order through the interlocutory appeal procedures established by OCGA § 5-6-34 (b).  See *Sosniak v. State*, 292 Ga. 35, 44 (734 SE2d 362) (2012) (Nahmias, J., concurring) (noting that, although the collateral order doctrine did not apply, the defendants could "still obtain relief [] through the interlocutory appeal procedures provided by statute, see OCGA § 5-6-34 (b)").  We acknowledge that, in this particular case, this avenue of review has been exhausted, but it was nonetheless available and will be available to similarly situated attorneys in future cases.[13]

---

[13] In circumstances such as the one presented in this case, trial courts should seriously consider issuing certificates of immediate review and the Court of Appeals should seriously consider granting interlocutory review, especially if there is "any substantial question" as to the merits of the ruling. *Rivera*, 298 Ga. at 777.

"Another long-recognized option," while not the most favorable, is for an attorney to disobey the order and potentially be held in contempt of court. *Mohawk Indus., Inc.*, 558 U.S. at 111 (II) (B). If an attorney's motion to withdraw is denied and the attorney feels strongly enough that he or she is being compelled to violate the applicable rules of professional conduct, or otherwise imperil a client's constitutional rights, the attorney can refuse to comply with the trial court's order denying the motion to withdraw as counsel and potentially be held in contempt for violating that order. The attorney can then appeal directly from any resulting contempt ruling under OCGA § 5-6-34 (a) (2). Cf. *Johnson & Johnson*, 226 Ga. App. at 82 (citing *Cobbledick v. United States*, 309 U.S. 323, 327 (60 SCt 540, 84 LE 783) (1940), and adopting, in a civil case, "the United States Supreme Court's rationale that in the rare case when appeal after final judgment will not cure an erroneous [interlocutory] order, a party may defy the order, permit a contempt citation to be entered against him, and challenge the order on direct appeal of the

19

contempt ruling").[14]  See also *Mohawk Indus., Inc.*, 558 U.S. at 111

(II) (B) (noting that "when the circumstances warrant it, a district

court may hold a noncomplying party in contempt," and "[t]he party

can then appeal directly from that ruling").  We recognize that this

avenue for appellate review places the attorney in a very difficult

position, but it is a means of obtaining direct appellate review set

forth in Georgia statutory law that lifts the issue presented in this

case out of the realm of non-reviewability.  See OCGA § 5-6-34 (a)

(2).[15]

---

[14] In *Cobbledick*, the United States Supreme Court concluded that where a non-party witness was not permitted to immediately appeal an interlocutory order of a trial court, the witness could either await final judgment for the trial court's order to be reviewed by the appellate court, or "[l]et the court go farther, and punish the witness for contempt of its order—then arrives a right of review; and this is adequate for his protection without unduly impeding the progress of the case."  309 U.S. at 327. See also *United States v. Ryan*, 402 U.S. 530, 532-533 (91 SCt 1580, 29 LE2d 85) (1971) (noting that the United States Supreme Court has "consistently held that the necessity for expedition in the administration of the criminal law" requires forcing a party or non-party to make a "choice between compliance with a trial court's order" and "resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal").

[15] Additionally, we note that, while  a trial court's power to revoke or reconsider an interlocutory ruling in a criminal case ordinarily ends with the expiration of the term of court in which the order was entered, an "important exception" to this rule allows "after-term reconsideration, at least of constitutional issues, where the 'evidentiary posture' of the issue has changed."

Lastly, we acknowledge Scarborough's specific argument that he may face disciplinary action from the State Bar for violation of Rule 1.7 if he is required to continue the joint representation of Defendants, but we conclude that any such discipline is speculative at this point.[16] And, given our conclusion in this case, we need not address that issue at this time.

We recognize that federal and other state courts have reached different conclusions in evaluating whether to allow an appeal of an order denying a motion to withdraw as counsel due to alleged conflicts of interest under the collateral order doctrine.[17] However,

_____

*State v. Ross*, 293 Ga. 834, 835 (750 SE2d 305) (2013) (quoting *Moon v. State*, 287 Ga. 304, 309 (2) (696 SE2d 255) (2009) (Nahmias, J., concurring)). If additional evidence is presented in a case casting the original ruling in doubt, a trial court would be authorized to revise it in accordance with the newly presented facts. See generally *Ross*, 293 Ga. at 835-836.

[16] Attorneys who have been ordered over objection to continue representation that potentially raises ethical conflicts may be faced with taking every step possible to avoid such violations during the representation, including carefully representing their clients going forward by omitting issues creating conflicts from their filings and by noting those omissions and the basis thereof on the record.

[17] See *Commonwealth v. Wells*, 719 A2d 729, 731 (Pa. 1998) (holding that the collateral order doctrine did not apply in this context because a criminal defendant has a future remedy and his right to appeal would not be lost); *United States v. Bellille*, 962 F3d 731, 737 (II) (3d Cir. 2020) (holding that an order denying an attorney's motion to withdraw satisfied the collateral order

these cases are distinguishable from the present case, and unlike Georgia's appellate courts, none of these courts examined whether a governing appellate statute exists in their respective states. Even if such statutory schemes do exist, these cases speak nothing about the "statutory scheme for appellate review of interlocutory orders set out by our General Assembly in OCGA § 5-6-34"—or how the collateral order doctrine that Georgia courts have applied fits into that procedural framework.[18] *Rivera*, 298 Ga. at 776. See also

doctrine because "the harm of violating one's ethical obligations would be complete and could not be undone after trial"); *United States v. Oberoi*, 331 F3d 44, 47 (I) (2d Cir. 2003) (holding that the collateral order doctrine applied "[b]ecause the district court's order conclusively determined the issue of the [attorney's] continued representation of [the defendant,]" and could not "be effectively reviewed on final appeal").

[18] We are also aware of other federal and state cases where the appellate courts determined that the collateral order doctrine applied to trial court orders denying motions to withdraw as counsel, but these courts were not considering motions based on counsel's alleged ethical conflicts nor were they apparently subject to an appellate statutory framework similar to Georgia's. The motions at issue in these cases arose from a client's refusal to follow the attorney's legal advice, communicate or meet with the attorney, and/or pay the attorneys for his or her services. See, e.g., *Commonwealth v. Magee*, 177 A3d 315, 321 (Pa. 2017); *United States v. Barton*, 712 F3d 111, 116 (I) (2d Cir. 2013); *In re Franke*, 55 A3d 713, 719 (I) (Md. Ct. App. 2012); *United States v. Shaw*, No. 08-6751, 2009 WL 226030 at *1 (4th Cir. Jan. 30, 2009); *Commonwealth v. Reading Group Properties*, 922 A2d 1029, 1032-1033 (Pa. 2007); *Galloway v. Clay*, 861 A2d 30, 32-33 (II) (D.C. Ct. App. 2004); *Fidelity Nat. Title Ins. Co. of*

*American Gen. Financial Svcs. v. Jape*, 291 Ga. 637, 644-645 (732 SE2d 743) (2012) (Nahmias, J., concurring) (holding that OCGA § 5-6-34 "is not a run-of-the-mill procedural provision," but "a *jurisdictional* law by which the General Assembly has limited the authority of Georgia's appellate courts to hear certain cases" (emphasis in original)).

III. *Conclusion*

Accordingly, we conclude that a trial court's order denying a motion to withdraw as counsel based upon alleged conflicts of interest does not fall within the "very small class" of cases that are directly appealable under the collateral order doctrine, *Duke*, 306 Ga. at 174 (1), and we affirm the judgment of the Court of Appeals. Because the "scheme for appellate interlocutory review is legislative in nature," should "the General Assembly determine[] that the established framework does not adequately safeguard the interests"

---

*New York v. Intercounty Nat. Title Ins. Co.*, 310 F3d 537, 539 (7th Cir. 2002); *Whiting*, 187 F3d at 319-320 (a).

23

at stake here, "it is for that body to change it." *Rivera*, 268 Ga. at 777-778.

*Judgment affirmed. All the Justices concur, except Peterson, P.J., not participating, and Colvin, J., disqualified.*

PINSON, Justice, concurring.

I concur fully in the Court's opinion because it correctly applies our collateral-order doctrine. I write separately to highlight the doubtful legal footing of that doctrine, which, in my view, adds another reason to not expand its reach here.

1. As the Court explains, our collateral-order doctrine allows a party to appeal certain categories of interlocutory rulings before final judgment without having to use the statutory procedure for interlocutory appeals, see OCGA § 5-6-34 (b). We applied this doctrine for the first time in *Patterson v. State*, 248 Ga. 875 (287 SE2d 7) (1982), where we held that an interlocutory order denying a plea of double jeopardy was immediately appealable "without resort to" our interlocutory-appeal statute.[19] Id. at 875. And later that year, in *Scroggins v. Edmondson*, 250 Ga. 430 (297 SE2d 469)

---

[19] When we decided *Patterson*, the procedures for interlocutory appeals were found at Ga. Code Ann. § 6-701 (a) (2).

(1982), we decided that the doctrine could be applied in both criminal and civil cases.

In these cases, our Court imported the collateral-order doctrine from federal law. In *Patterson*, we quoted at length and with approval the U.S. Supreme Court's application of the federal collateral-order doctrine in *Abney v. United States*, 431 U.S. 651 (97 SCt 2034, 52 LE2d 651) (1977), which approved immediate appeals of denials of pleas of double jeopardy, and we rested our holding on those "considerations." *Patterson*, 248 Ga. at 876. And in *Scroggins*, we described our holding in *Patterson* as "adopt[ing] the 'collateral order' exception to the final judgment rule announced in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (69 SCt 1221, 93 LEd 1528) (1949)," and offered no further justification for adding that doctrine to Georgia law. *Scroggins*, 250 Ga. at 431 (1) (c).

We have flagged before the problems with "simply recit[ing] holdings of the United States Supreme Court . . . and uncritically import[ing] them into" Georgia law. *Elliott v. State*, 305 Ga. 179, 188

26

(II) (C) (824 SE2d 265) (2019). See also *Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 391-93 (870 SE2d 430) (2022) (Peterson, J., concurring) (calling into question our "frequent[]" practice of relying on federal case law interpreting Article III of the U.S. Constitution or adopting it "wholesale" as Georgia law "without actually explaining why" it matters "for the different question of Georgia standing"). The meaning of legal text—constitutional, statutory, or otherwise—is determined "primar[ily]" by its "context, which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text." *City of Guyton v. Barrow*, 305 Ga. 799, 805 (3) (828 SE2d 366) (2019). So, when we need to figure out the meaning of *Georgia* law, decisions of federal courts—even the U.S. Supreme Court—are helpful "only to the extent that the Court's decisions actually were guided by th[e] same language, history, and context" of the Georgia law in question. *Elliott*, 305 Ga. at 188 (II) (C). When we rely on such federal

decisions without making sure the relevant text and context match up, we risk giving an "interpretation" of Georgia law that is arbitrary, wrong, or both.

Unfortunately, our collateral-order doctrine could be the poster child for this mistake. To see why, compare the relevant statutory language and context under federal and Georgia law.

In federal law, the collateral-order doctrine is rooted in 28 USC § 1291, which grants federal courts of appeals "jurisdiction of appeals from all *final decisions* of the district courts." Id. (emphasis added). The U.S. Supreme Court has explained that the doctrine represents a "practical rather than a technical construction" of that "final decisions" language. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (II) (A) (130 SCt 599, 175 LE2d 458) (2009) (citing *Cohen*, 337 U.S. at 546). Under that construction, "the statute encompasses not only judgments that 'terminate an action,' but also a 'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final'" because they are

conclusive, effectively unreviewable, and separate from the underlying merits of the case. *Mohawk Indus., Inc.*, 558 U.S. at 106 (II) (A) (quoting *Cohen*, 337 U.S. at 546). Reasonable jurists can disagree on whether that doctrine fits comfortably within the phrase "final decisions," but that language at least allows a case to be made that it encompasses more than just final judgments that leave no claims pending below.

The same cannot be said for Georgia law. It is true that our Court pitched the collateral-order doctrine as a "broader construction" of Georgia's own appellate-jurisdiction statute when we imported the doctrine from federal law. *Patterson*, 248 Ga. at 876 (citing former Ga. Code Ann. § 6-701 (a), which is now OCGA § 5-6-34 (a)). But when we imported the doctrine, we didn't do any actual "construction" of that statute. If we had, the problem with that move would have quickly become clear. At that time, our appellate-jurisdiction statute authorized an appeal "[w]here the judgment is final—that is to say—where the cause is no longer pending in the

court below." Ga. Code Ann. § 6-701 (a) (1). The current version is similar: it authorizes an appeal from "[a]ll final judgments, that is to say, where the case is no longer pending in the court below." OCGA § 5-6-34 (a) (1). It is hard to think of a clearer way to reject a doctrine that allows appeals under this provision of orders in cases that are still pending in the court below. And indeed, for around 140 years, our Court and the Court of Appeals have consistently held that this language (and materially identical language in the prior and current versions of the statute) means a judgment is *not* "final" and appealable under this provision if any portion of the case remains pending below. See *Seals v. State*, 311 Ga. 739, 741-42 (2) (a) (860 SE2d 419) (2021) (tracing statutory history of OCGA § 5-6-34 (a) and collecting cases confirming that interpretation).[20] Unlike

---

[20] The eagle-eyed reader might notice that the prior version of this statute said a judgment is final where the "cause" is no longer pending, Ga. Code Ann. § 6-701 (a) (1), while the current version says a final judgment is one where the "case" is no longer pending, see OCGA § 5-6-34 (a) (1). But we equated "cause" with "case" as far back as 1883. See *Zorn v. Lamar*, 71 Ga. 80, 82 (1883) (holding that original version of this statute, which used the word "cause," meant that "as long as a defendant remains in the court below or other issues remain untried there, the case is pending there, and no final judgment has been had"). And we have since confirmed that this change did not

28 USC § 1291 (a)'s "final decisions" language, OCGA § 5-6-34 (a) leaves no wiggle room for a doctrine that allows appeals when any part of the case is still pending in the trial court.

If that language were not a clear enough rejection of a federal-style collateral-order doctrine, the statutory structure around OCGA § 5-6-34 (a)'s final-judgment rule is telling, too. That structure tells us in at least two ways that our jurisdictional statutes don't contemplate that doctrine. First, our statute lists 12 further categories of "judgments or orders" that can be appealed whether or not they are "final." OCGA § 5-6-34 (a). Including this kind of list in our statute, which the General Assembly updates with some regularity,[21] suggests (quite strongly, I think) that the role the

---

materially alter the statute's meaning. See *Seals*, 311 Ga. at 742 (2) (a).

[21] See, e.g., Ga. L. 2016, p. 342, § 1 (adding subsection (a) (13): "All judgments or orders entered pursuant to Code Section 9-11-11.1"); Ga. L. 2013, p. 736, § 1, (modifying the language of subsection (a) (11)); Ga. L. 2012, p. 944, § 8-1 (adding subsection (a) (12): "All judgments or orders entered pursuant to Code Section 35-3-37"); Ga. L. 2007, p. 555, § 2 (adding subsection (a) (11): "All judgments or orders in child custody cases including, but not limited to, awarding or refusing to change child custody or holding or declining to hold persons in contempt of such child custody judgment or orders"); Ga. L. 2006, p. 382, § 2 (adding now-subsection (a) (10): "All judgments or orders entered pursuant to subsection (c) of Code Section 17-10-6.2").

collateral-order doctrine plays in federal law—identifying categories of orders that deserve appeals before final judgment—has been reserved by and for the General Assembly.[22] Second, our statute allows parties to seek interlocutory review of a ruling if the trial court certifies that the ruling is "of such importance to the case that immediate review should be had." OCGA § 5-6-34 (b). So Georgia law provides a statutory mechanism for seeking immediate review when important rights would be lost without it—again displacing a basic role of the federal collateral-order doctrine.[23]

---

[22] By contrast, the U.S. Congress's message has been more mixed: although federal law grants appellate jurisdiction over three narrow categories of interlocutory orders, see 28 USC § 1292 (a), Congress has not updated that list in 40 years, and it has further granted the U.S. Supreme Court power to adopt rules either "defin[ing] when a ruling of a district court is final for the purposes of appeal under section 1291," *Mohawk Indus., Inc.*, 558 U.S. at 113-14 (II) (C) (quoting 28 USC § 2072 (c)), or "provid[ing] for an appeal of an interlocutory decision . . . that is not otherwise provided for" under 28 USC § 1292, id. at 114 (quoting 28 USC § 1292 (e)).

[23] Federal law offers a case-by-case safety valve for interlocutory review, too, but a district court's discretion to approve an order for such treatment is more limited than a Georgia trial court's. Compare 28 USC § 1292 (b) (allowing federal court of appeals to exercise discretion to permit an appeal from an order if the district judge states in writing that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation") with OCGA § 5-6-34 (b) (allowing interlocutory review if the trial court certifies that the ruling is "of such

In short, the language, context, and history of our appellate-jurisdiction statutes are not the same as those that underpin the federal collateral-order doctrine, and none supported importing it into our law.

2. I do not point all of this out to suggest that we should abandon the collateral-order doctrine—either in this case, or even in another down the road. No one here has asked us to reconsider the doctrine. And stare decisis may well warrant retaining the existing decisions that apply the doctrine to allow appeals of certain categories of interlocutory orders, which span four decades of our case law.

But I do think the doubtful authority for importing the doctrine at all cements the case against expanding its reach here. It is an especially troubling kind of error to arrogate to ourselves as appellate courts the authority to bend the limits of our own power to review cases. See *Duke v. State*, 306 Ga. 171, 182 (3) (c), 186-87 (4)

_____

importance to the case that immediate review should be had").

(829 SE2d 348) (2019) (acknowledging "core separation of powers principle" that prevents courts from claiming authority to allow appeals outside of statutory scheme); *Gable v. State*, 290 Ga. 81, 85 (2) (b) (720 SE2d 170) (2011) ("[C]ourts have no authority to create equitable exceptions to jurisdictional requirements imposed by statute." (citation and punctuation omitted)). See also *Cook v. State*, 313 Ga. 471, 479 (2) (a) (870 SE2d 758) (2022) (overruling "judicially creat[ed]" trial court out-of-time appeal procedure). Nor does the error seem harmless as a practical matter. When it applies, the collateral-order doctrine allows litigants to bypass the process for interlocutory review that the General Assembly chose to start with trial courts, see OCGA § 5-6-34 (b), thus "divest[ing] trial courts of one of their essential tools for controlling litigation before them." *Duke*, 306 Ga. at 186 (4) ("By requiring the prompt, affirmative assent of the trial court before an interlocutory appeal can proceed, OCGA § 5-6-34 (b) allows the trial court to manage litigation before it to a conclusion except in those circumstances in which the trial

court believes that the issues presented by a litigant need clarification by an appellate court *before* the case proceeds."). And because the doctrine allows litigants to argue for review of categories of nonfinal orders in court, it pulls many if not most of those arguments away from the legislature, which is generally supposed to make categorical policy judgments and already does make these particular judgments on a regular basis. See OCGA § 5-6-34 (a). By resisting the call in this case to recognize another non-statutory exception to our statutory final-judgment rule, the Court's opinion avoids perpetuating these problems.

With these things in mind, I concur fully in the Court's opinion. I am authorized to state that Justice Warren and Justice Bethel join in this concurrence.