320 Ga. 624
FINAL COPY

S23G1029. WASSERMAN v. FRANKLIN COUNTY.

PINSON, Justice.

The Georgia Constitution grants Georgia courts the judicial power. This power allows courts to resolve controversies about the relative rights and obligations of the parties before us, and to enter judgments that bind the parties to those decisions. The limits of this power are enforced in part through the doctrine of standing, which imposes threshold requirements that a party must meet to maintain a lawsuit. In *Sons of Confederate Veterans v. Henry County Bd. of Commissioners.*, 315 Ga. 39 (880 SE2d 168) (2022) ("*SCV*"), we concluded that the Georgia Constitution imposes a basic standing requirement: to invoke the judicial power of a Georgia court, a plaintiff must assert at a minimum that she has a legal right at stake, because without a right at stake, there is no actual controversy between the parties for a court to resolve.

Our standing holding in *SCV* requires us to revisit an earlier

precedent. Before *SCV*, this Court had at times "uncritically imported" holdings from federal courts about federal law into Georgia standing law. In one such decision, we adopted the federal doctrine of "third-party standing," which allows a plaintiff who has asserted none of her own rights to bring a lawsuit by asserting the rights of third parties who are not before the court. And the plaintiff in this case relies on this federal theory of standing for the only claim on review in this Court. Given that theory's apparent conflict with the basic constitutional standing rule we recognized in *SCV*, we must consider whether the federal doctrine survives as a means of obtaining standing in Georgia courts.

I. *Background*

Sherran Wasserman agreed to sell land in Franklin County to Anthony Pham. The sale was contingent on the approval by the Franklin County Board of Commissioners of a conditional use permit that would allow Pham to build and operate chicken houses on the property. Pham applied for the permit, but after a public hearing, the Board voted unanimously to deny the application.

After Pham's application was denied, Wasserman sued the Board and the County. She initially brought a number of claims under state and federal law, but she voluntarily dismissed some of the claims and conceded others, and the trial court dismissed her remaining state-law claims because they were barred by sovereign immunity. That left two claims under federal law: a claim that the County violated Pham's rights under the Equal Protection Clause of the United States Constitution because it denied his application based on his race, and a claim that the County violated Wasserman's equal protection rights as a "class of one" because it had no rational basis for denying Pham's application. The County moved for summary judgment, contending that Wasserman did not have standing to assert a violation of Pham's equal protection rights, and that her "class of one" claim failed as a matter of law because Wasserman was not similarly situated to people whose applications were approved and the objective criteria on which the denial was based had a rational basis.

After a hearing, the trial court denied summary judgment. As

to standing, the court applied the federal doctrine of "third-party standing," citing the decision of this Court that had adopted that doctrine, see *Feminist Women's Health Center v. Burgess*, 282 Ga. 433 (651 SE2d 36) (2007). Applying the test supplied by that doctrine, the court concluded that genuine issues of material fact as to whether parts of the third-party-standing test were met precluded summary judgment on standing. The court went on to address the merits of Wasserman's equal protection claims and concluded that genuine issues of material fact precluded summary judgment on either of those claims.

The Court of Appeals reversed. Like the trial court, the Court of Appeals assessed whether Wasserman had standing to assert Pham's equal protection rights by applying the federal doctrine of third-party standing. *Franklin County v. Wasserman*, 367 Ga. App. 694, 696-697 (1) (888 SE2d 219) (2023).[1] But the Court of Appeals

---

[1] The Court of Appeals also recited the three-part test for Article III standing in federal courts, citing our decision in *SCV*, 315 Ga. at 45 (2) (a). But although we described that federal test in *SCV*, we explained that "federal standing requirements do not control" the question whether a litigant has standing in state courts, and we went on to reject that standard in favor of one

4

rejected the trial court's conclusion that issues of fact precluded summary judgment on that question, concluding as a matter of law that Wasserman had not shown a sufficiently "close relationship" with Pham or that he faced a hindrance to bringing his own equal protection claim. Id. at 697 (1). The Court of Appeals went on to conclude that Wasserman's "class of one" claim could be rejected as a matter of law. Id. at 699 (2).

Wasserman asked us to review the Court of Appeals's conclusion that she lacked standing to assert Pham's equal-protection rights.[2] We granted review to consider whether a plaintiff may properly rely on the federal doctrine of third-party standing to establish constitutional standing in Georgia courts.[3]

II. *Constitutional Standing*

Time and again we have criticized our own past practice of

grounded in Georgia law. Id.

[2] Wasserman did not seek review with respect to her "class of one" equal protection claim in this Court, so only the standing question is properly before us on the writ of certiorari.

[3] The Attorney General filed an amicus brief in support of the appellee, and the appeal was orally argued on October 22, 2024.

"uncritically importing" holdings of federal courts to resolve questions about the meaning of Georgia law. See *SCV*, 315 Ga. at 45 (2) (a); *Elliott v. State*, 305 Ga. 179, 188 (II) (C) (824 SE2d 265) (2019); *Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 392 (870 SE2d 430) (2022) ("*BVMF*") (Peterson, J., concurring); *Williams v. Powell*, 320 Ga. 221, 236 (2) (908 SE2d 599) (2024) (Peterson, P. J., concurring); *Buckner-Webb v. State*, 314 Ga. 823, 834 (1) (878 SE2d 481) (2022) (Pinson, J., concurring). Like any legal text, the meaning of Georgia law is determined primarily by its context, including the structure and history of the text itself and the legal and historical backdrop of its enactment. See *City of Guyton v. Barrow*, 305 Ga. 799, 805 (3) (828 SE2d 366) (2019). So unless a federal decision has interpreted a provision that shares language and context with the provision of Georgia law in question, it is of little use in figuring out the meaning of the Georgia provision. Put another way, "[w]hen we rely on such federal decisions without making sure the relevant text and context match up, we risk giving an 'interpretation' of Georgia law that is arbitrary, wrong, or both." *Buckner-Webb*, 314 Ga. at 834

6

(1).

Just so with constitutional standing, the doctrine that polices constitutional limits on the judicial power. In the past, this Court has "uncritically adopted" certain aspects of federal standing doctrine. *SCV*, 315 Ga. at 45 (2) (a). But in our recent decision in *SCV*, we questioned and then put a stop to that practice, at least with respect to questions of constitutional standing in Georgia courts. As we explained there, federal standing doctrine is grounded in the United States Constitution's limitation of the federal judicial power to only certain kinds of "cases" and "controversies." See id. (quoting U.S. Const. Art. III, Sec. 2, Cl. 1). But that language is not found in the Georgia Constitution, and as the balance of our decision showed, careful attention to the legal context of the Georgia Constitution's grant of the "judicial power" to our courts yields a doctrine of constitutional standing that is materially different from federal standing doctrine. See id. See also *BVMF*, 313 Ga. at 393 (Peterson, J., concurring). Put simply, *SCV* made clear that questions about standing to invoke the judicial power of Georgia courts must be answered by

construing and applying the Georgia Constitution, not by borrowing federal standing doctrine (however convenient that might have been).

Although *SCV* put an end to our old borrowing practice, leftovers remain. One is the federal doctrine of "third-party standing," which allows a plaintiff to bring a lawsuit by "asserting the rights of a third party" instead of her own, as long as she can meet a three-part test. See, e.g., *Powers v. Ohio*, 499 U.S. 400, 411 (III) (111 SCt 1364, 113 LE2d 411) (1991). This Court uncritically imported that doctrine into our law less than 18 years ago, see *Burgess*, 282 Ga. at 434-435 (1), and so the courts below applied it here. Having now discarded federal standing doctrine as a proper source of rules of constitutional standing in favor of our own Constitution, we must ask whether the borrowed federal doctrine of third-party standing survives as a rule of standing in Georgia courts. That might be so for one of two reasons: That theory of standing might pass muster under Georgia's own doctrine of constitutional standing. Or, if not, stare decisis might compel us to retain the precedent that borrowed the

8

federal doctrine. We consider each possibility in turn.

A. *Georgia's Law of Constitutional Standing*

We start with the question whether a plaintiff may establish constitutional standing in Georgia courts under a theory of standing that looks like federal third-party standing. This is a question of constitutional construction. The doctrine of standing polices longstanding limits on a court's power to resolve legal disputes, and in Georgia, this power — the "judicial power" — is conferred by our state Constitution. See *SCV*, 315 Ga. at 45 (2) (a). Thus, to determine whether a plaintiff may sue in Georgia courts under a federal-third-party-standing theory, "we must consider whether the . . . judicial power that the Georgia Constitution vests in Georgia courts" allows our courts to resolve such a dispute. Id. at 46 (2) (a).

We have already established the framework for doing this constitutional construction. In *SCV*, we explained that Article VI, Section I, Paragraph I of the Georgia Constitution of 1983 expressly "vest[s]" the "judicial power of the state" in certain classes of courts. 315 Ga. at 46 (2) (a). This provision has been "carried forward

9

without material change from its initial appearance in the 1798 Constitution to the current Constitution of 1983," id., so we presume that it "has retained the original public meaning that provision had" when it entered the 1798 Constitution, "absent some indication to the contrary." Id. at 47 (2) (a) (quoting *Elliott*, 305 Ga. at 183 (II) (A)). That meaning is in turn determined by considering "the 'common and customary usages of the words,' as informed by their context, including the broader legal backdrop — constitutional, statutory, decisional, and common law — in which the text was adopted." Id. (quoting *Elliott*, 305 Ga. at 186-187 (II) (B)). But as we acknowledged in *SCV*, the language of the Judicial Power Paragraph alone "sheds little light" on the limits of the judicial power or the standing requirements that police those limits, so context becomes all the more important. Id. Thus, to understand whether the judicial power of Georgia courts allows us to resolve cases where the plaintiff relies on a particular theory of standing, we focus first on "the legal background against which the original Judicial Power Paragraph was adopted in the 1798 Constitution, with the common law providing

10

the most critical context." Id. In doing so, as we did in *SCV*, we also consider whether our later decisional law relevant to the scope of the "judicial power" sheds any light on the meaning of that language. See id. at 50-62 (2) (b)-(c); *Cobb County v. Floam*, 319 Ga. 89, 94 (1) (901 SE2d 512) (2024) (explaining that our review in *SCV* turned up "consistent and definitive precedent" that established a rule of constitutional standing rooted in the meaning of the "judicial power"). See also *Ammons v. State*, 315 Ga. 149, 170 (1) n.19 (880 SE2d 544) (2022) (Pinson, J., concurring) ("The judicial power has long been understood to include the power to 'liquidate,' or settle with finality, disputes about the meaning and operation of written laws." (quoting The Federalist No. 37, at 236 (James Madison) (Jacob E. Cooke ed., 1961))).

The subject of this analysis is the federal doctrine of third-party standing. That doctrine allows a plaintiff to ask a federal court to decide the legal rights of a party not before the court rather than the plaintiff's own legal rights, as long as the plaintiff can establish an "injury in fact" and, at least in some cases, a "close relation" to

the third party and some "hindrance" to the third party's ability to protect his own interests. *Powers*, 499 U.S. at 411 (III). Under this doctrine, for example, a beer vendor had third-party standing to sue Oklahoma officials in federal court to enjoin them from enforcing state laws that set higher age limits for selling beer to men than to women. See *Craig v. Boren*, 429 U.S. 190 (97 SCt 451, 50 LE2d 397) (1976). The beer vendor did not assert that Oklahoma had violated any of her own legal rights by imposing the different age restrictions. See id. But the Supreme Court held that she had third-party standing to bring a claim that the equal protection rights of the affected men — who were not parties to the litigation — were violated, because enforcement of the laws in question caused her an "injury in fact" in the form of "a direct economic injury through the constriction of her buyers' market." Id. at 194 (I). So, the basic question here is whether a plaintiff would have constitutional standing under this kind of theory in Georgia courts: that although the challenged conduct allegedly violated only a third party's legal rights, the conduct caused the plaintiff an "injury in fact," so the plaintiff can ask a court

12

to decide whether the rights of the third party were violated.

This is a different question from the ones we had to answer in *SCV*, where we considered whether our Constitution imposes jurisdictional standing requirements in the first place (and if so, who had standing to sue to enforce the public rights at issue there). But the construction work we did in *SCV* goes a long way toward answering whether a plaintiff has standing under a federal-third-party-standing theory in Georgia courts. As we determined there, both the relevant legal context (mostly the common law) and our later decisional law make clear that, at a minimum, a plaintiff must assert a violation of her legal rights — either her own private right, or a public right shared by the relevant community — to invoke the judicial power of Georgia courts, and that a plaintiff cannot establish standing by asserting merely factual harm or damage. See *SCV*, 315 Ga. at 62 (2) (c) (iii). So we start here by reviewing the evidence of these conclusions, with our focus trained on the implications for a plaintiff asserting a theory of third-party standing. We then move beyond the scope of *SCV*'s inquiry and consider directly whether anything in the

relevant legal context opens the door to a theory like federal third-party standing.

1. *Minimum Standing Requirements*

(a) *Common Law*

The reach of the "judicial power" is informed in the first instance by the legal backdrop against which it was first granted to Georgia courts in 1798. See *SCV*, 315 Ga. at 46 (2) (a). In 1798, that legal backdrop was largely made up of the common law.[4] So the kinds of actions courts could (and could not) hear at common law are "the most critical context" of the reach of the judicial power of Georgia courts. Id. at 47 (2) (a).

At common law, actions could be classified into two broad categories: actions to resolve private rights, and actions to resolve public rights. See, e.g., 3 William Blackstone, Commentaries on the Laws of England *2 (1768) (dividing "wrongs" into "two sorts or

---

[4] In 1784, our legislature adopted the common law of England as of May 14, 1776, as Georgia law, see OCGA § 1-1-10 (c) (1), and so it "has long been the backstop law of Georgia." *State v. Chulpayev*, 296 Ga. 764, 780 (3) (b) (770 SE2d 808) (2015).

14

species": "private wrongs," which are "an infringement or privation of the private or civil rights belonging to individuals, considered as individuals," and "public wrongs," which are a "breach and violation of public rights and duties, which affect the whole community, considered as a community"). Whether the right being adjudicated is private or public can matter for assessing constitutional standing, see *SCV*, 315 Ga. at 48-49 (2) (a), so it makes sense to address these distinct kinds of actions separately. (But as we will see, the basic requirements to maintain each kind of action were similar.)

(i) *Private Rights*

We have explained before that private rights are "those belonging to an individual as an individual." *SCV*, 315 Ga. at 47 (2) (a) (citing 3 Blackstone, Commentaries *2). See also 1 Blackstone, Commentaries *119 (also describing private rights as "absolute" rights that "appertain[ed] and belong[ed] to particular men[ ] merely as individuals"). According to Blackstone, at common law such private rights included three categories of "absolute" rights: a person's rights to "personal security," "personal liberty," and "private

15

property." *Kennestone Hosp., Inc. v. Emory Univ.*, 318 Ga. 169, 178 (2) (a) (897 SE2d 772) (2024) (quoting 1 Blackstone, Commentaries *129).[5] Other rights held by individuals, like contractual rights and the right to vote, were classified as private rights, too. See id.; *Coleman v. Miller*, 307 U.S. 433, 469 (59 SCt 972, 83 LE 1385) (1939) (Frankfurter, J., concurring) (describing Lord Holt's opinion in the "famous" common law decision of *Ashby v. White*, 92 Eng. Rep. 126, 2 Ld. Raym. 938 (K.B. 1703), as being "permeated with the conception that a voter's franchise is a personal right"); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 344-345 (6 LE 606) (1827) (Marshall, C. J., concurring) (likening contract rights to rights of property that were "natural rights" that were "brought with man into society"); 3 Blackstone, Commentaries *116 (describing breach of contract as a cause of action based on a private wrong); id. at *153-166 (discussing rules

---

[5] Blackstone described personal security as a "person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." 1 Blackstone, Commentaries *125. Personal liberty was "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct[,] without imprisonment or restraint, unless by due course of law." Id. at *130. And property rights were a person's "free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land." Id. at *134.

16

of contract law in Blackstone's volume dedicated to private wrongs).

At common law, it was well understood that a core function of the courts was to resolve disputes about private rights. See *SCV*, 315 Ga. at 47-48 (2) (a) ("Resolving private-rights disputes has been historically recognized as 'the core' of judicial power."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (2 LE 60) (1803) ("The province of the court is, solely, to decide on the rights of individuals."); 3 Blackstone, Commentaries *2 ("The more effectually to accomplish the redress of private injuries, courts of justice are instituted in every civilized society."). As Blackstone put it, if wrongs were "considered as merely a [de]privation of right, the one natural remedy for every species of wrong is the being put in possession of that right, whereof the party injured is deprived." Id. at *116. And a person could obtain this remedy — whether through specific performance or the payment of damages — by bringing to court "a diversity of suits and actions," which were simply "the lawful demand of one's right." Id. See also 1 Blackstone, Commentaries *137 (stating that a "right of every Englishman is that of applying to the courts of justice

17

for redress of injuries"); 2 Edward Coke, The First Part of the Institutes of the Laws of England *285 (1st Am. Ed., 16th Euro. Ed. 1812) (1628) ("Action n'est auter chose que loyall demande de son droit." [An action is nothing more than an honest demand for one's right.]).

Given that actions in court were understood as the way to settle disputed private rights, the minimum requirement to maintain such an action is not surprising: a plaintiff needed to assert that her rights had been invaded. Two kinds of evidence from the common law make this clear.

First, common law courts would allow plaintiffs to maintain an action whenever they asserted the violation of their private rights, even when they did not seek or try to prove actual harm or damage. In such cases, if the plaintiff could establish the violation of her rights, that was enough to prevail: courts would vindicate the plaintiff's rights by awarding at least nominal damages, a trivial sum that reflected that the plaintiff had proved the violation of her rights. And this was true for all kinds of actions at common law — torts, trespass, violation of riparian rights, infringement of voting

18

rights, and more. See, e.g., 3 Blackstone, Commentaries *123 ("For wherever the common law gives a right or prohibits an injury, it also gives a remedy by action."); *Robinson v. Byron*, 30 Eng. Rep. 3, 3, 2 Cox 4, 5 (Ch. 1788) (awarding nominal damages for violation of riparian rights); *Entick v. Carrington*, 95 Eng. Rep. 807, 817, 2 Wils. 275, 291 (K.B. 1765) (allowing plaintiff to maintain action for trespass even if the alleged trespasser "does no damage at all"); *Chapman v. Pickersgill*, 95 Eng. Rep. 734, 2 Wils. 145 (K.B. 1762) ("[W]herever there is an injury done to a man's property by a false and malicious prosecution, it is most reasonable he should have an action to repair himself."); *Ashby*, 92 Eng. Rep. at 129, 137 (Lord Holt arguing in dissent in a voting rights case that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]"; the House of Lords overturned the majority decision, thus validating Lord Holt's position, 91 Eng. Rep. 665, 3 Salk. 17 (H.L. 1703)). As Justice Story described this common law rule in a case he decided while riding circuit, "every violation imports damage; and if no other

be proved, the plaintiff is entitled to a verdict for nominal damages." *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 509 (C.C.D. Me. 1838). See also id. at 507 ("[F]rom my earliest reading, I have considered it laid up among the very elements of the common law, that, wherever there is a wrong, there is a remedy to redress it; and that every injury imports damage in the nature of it; and, if no other damage is established, the party injured is entitled to a verdict for nominal damages."); *Whipple v. Cumberland Mfg. Co.*, 29 F. Cas. 934, 936 (C.C.D. Me. 1843) (also Justice Story, calling this common law rule "well-known and well-settled"); 1 Theodore Sedgwick, A Treatise on the Measure of Damages 53 (1847) ("Wherever the invasion of a right is established, the English law infers some damage to the plaintiff."). Put simply, asserting the violation of the plaintiff's private rights was sufficient to maintain an action to vindicate those rights at common law.

Second, although plaintiffs could maintain an action by asserting a violation of their rights without asserting actual damage, the opposite — asserting damage without asserting a violation of their

20

rights — would not suffice. This was the meaning of the common law principle that no action would lie for damnum absque injuria, or "damage without injury." At common law, the term "damage" referred to the real-world harm suffered by a party, while "injury" typically referred to a *legal* injury: the violation of a legal right. See, e.g., *Cable v. Rogers*, 81 Eng. Rep. 259, 3 Bulst. 311, 312 (K.B. 1625) ("[I]njuria & damnum [injury and damage] are the two grounds for the having [of] all actions, and without these, no action lieth.");[6] *Burton v. Thompson*, 97 Eng. Rep. 500, 2 Burr. 664 (K.B. 1758) (saying that "I do not think we ought to interfere, merely to give the plaintiff [a new trial] where there has been no real damage, and where the injury is so trivial as not to deserve above a half crown compensation," thus recognizing that there was still a legal injury since the evidence in the case showed that a right was violated); 3 Blackstone,

---

[6] As the language of *Cable v. Rogers* shows, at least some early common law courts required a showing of both legal injury and damage. But it is widely understood that the injury-plus-damage rule fell out of favor after *Ashby*, 91 Eng. Rep. 665, and it was well established by the time Georgia adopted the common law of England, that suits could be brought for nominal damages when a right was violated but no real-world damage could be proved.

Commentaries *2 (explaining that "private wrongs" are "an infringement or privation of the private or civil rights belonging to individuals, considered as individuals; and are thereupon frequently termed civil *injuries*" (emphasis added)); *Ashby*, 92 Eng. Rep. at 137 ("[A]n injury imports a damage, when a man is thereby hindered of his right."). So this phrase stood for the principle that "even an actual, real-world harm, if unaccompanied by a violation of a recognized legal right, 'does not lay a foundation for an action.'" *Sierra v. City of Hallandale Beach, Fla.*, 996 F3d 1110, 1124 (I) (C) (2) (11th Cir. 2021) (Newsom, J., concurring) (quoting *Ala. Power Co. v. Ickes*, 302 U.S. 464, 479 (58 SCt 300, 82 LE 374) (1938)). As the United States Supreme Court explained,

> injury, legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right. It is an ancient maxim, that a damage to one, without an injury in this sense (damnum absque injuria), does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain.

*Ala. Power Co.*, 302 U.S. at 479 (quoting *Parker v. Griswold*, 17 Conn. 288, 302-303 (1845)). Describing that same common law

22

principle a century earlier, Justice Story put it the same way: "no action lies in a case where there is damnum absque injuria, that is, where there is a damage done without any wrong or violation of any right of the plaintiff." *Webb*, 29 F. Cas. at 507 (Story, J.). See also *Beall v. Cockburn*, 8 Va. 162, 171 (1790) ("The appellee has sustained no loss, except what resulted from the state of the times. He sold his sterling money for a depreciating currency, and he has suffered by it; but it was damnum absque injuria; it was the common lot of all who sold property at that period."); *Palmer v. Mulligan*, 3 Cai. R. 307, 313 (N.Y. 1805) ("The act itself in erecting the dam, on the principles contended for by the plaintiffs' counsel, was a lawful act; and though in its consequences slightly injurious, the plaintiffs are remediless. . . . [I]t is a damnum absque injuria."); *Runnels v. Bullen*, 2 N.H. 532, 534 (1823) ("We have said the rights of others; because the property of others may be lessened in value, or impaired incidentally; and yet, if no rights are invaded, it is damnum absque injuria."); *Shufford v. Cline*, 35 N.C. 463 (1852) ("[A]lthough he may have sustained loss by the course of conduct, which the defendant

saw proper to pursue, still it was 'damnum absque injuria,' for there can be no injury unless the party has a right."); *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 140 (59 SCt 366, 83 LE 543) (1939) (damage resulting from economic competition, "otherwise lawful, is in such circumstances damnum absque injuria, and will not support a cause of action or a right to sue"). In other words, if a plaintiff desired to have her private rights adjudicated by a court at common law, she had to assert that her rights had been invaded in some way; asserting only that she had suffered some real-world harm or damage was not a sufficient basis for maintaining an action.

(ii) *Public Rights*

In contrast to private rights, public rights have been described as those rights that are shared by "the whole community, considered as a community, in its social aggregate capacity." 4 Blackstone, Commentaries *5. As we have explained before, "[c]lassic examples" of public rights include "the public's shared rights to navigate public waters and use public highways," "[t]he right to enforce compliance with penal law," and "proprietary rights held by government on

24

behalf of the people, like title to public lands and ownership of funds in the public treasury." *Kennestone Hosp.*, 318 Ga. at 177 (2) (a). See also Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 Mich. L. Rev. 689, 693 (I) (A) (2004) (addressing the traditional distinction between public and private rights).

At common law, many actions to vindicate public rights could not be brought by private parties at all. In fact, Blackstone largely equated "breach[es] and violation[s] of public rights and duties" (which he called "public wrongs") with "crimes and misdemeanors," and he explained that "the king, who 'is supposed by the law to be the person injured by every infraction of the public right belonging to that community,' is the 'proper prosecutor'" to vindicate those public rights. *SCV*, 315 Ga. at 48 (2) (a) (quoting 3 Blackstone, Commentaries *2; 4 Blackstone, Commentaries *2). The "king in his public capacity of supreme governor" was also generally the only party who could "have an action" for public nuisance. 3 Blackstone, Commentaries *219-220.

That said, the law sometimes granted private parties a right to

bring their own action to vindicate public rights. When it did, maintenance of such an action still required the plaintiff to assert a violation of her own rights. For example, people who were subject to the king's rule had standing to bring the ancient prerogative writs to assert the public interest when authorities subordinate to the king violated public duties. See *SCV*, 315 Ga. at 48-49 (2) (a) (citing Cass R. Sunstein, What's Standing After *Lujan*? Of Citizen Suits, "Injuries," and Article III, 91 Mich. L. Rev. 163, 171 (I) (A) (1) (1992)). And for someone other than the king to maintain an action for public nuisance, she would have to allege not only a violation of a public right that she shared as a member of the relevant public — i.e., the public nuisance — but also that she "suffer[ed] some extraordinary damage, beyond the rest of the king's subjects, by [that] public nuisance." 3 Blackstone, Commentaries *220. See also *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (I) (A) (136 SCt 1540, 194 LE2d 635) (2016), as revised (May 24, 2016) (Thomas, J., concurring) (explaining that an action for public nuisance was "historically considered an action to vindicate the violation of a public right" (citing 3

Blackstone, Commentaries *219)). There is no indication from early authorities on the common law or otherwise that a person could bring an action to vindicate a public right without at least being a member of the public who shared in that right — that is, without asserting that her own shared public rights were in dispute. See *SCV*, 315 Ga. at 49 (2) (a) ("[N]othing cited in those authorities suggests that any person not subject to the king's rule could invoke the king's power to control the subordinate functionaries and authorities of the king.").

*

So, to recap: At the time Georgia adopted the English common law as its own, a plaintiff at common law could maintain an action in civil court to vindicate her private rights and, as a member of the public, certain public rights. To maintain an action to vindicate a private right, a plaintiff had to assert her own private right. To bring suit in a public rights case, the plaintiff had to assert at a minimum that she held the public right as a member of the public.

(b) *Decisional Law*

These common law rules were the main legal backdrop against which our Constitution granted the "judicial power" to Georgia courts in 1798. See *SCV*, 315 Ga. at 46 (2) (a). And since that time, as this Court has had occasion to consider the scope of that power, we have recognized rules for maintaining an action that are consistent with these common law rules: in particular, that a plaintiff must assert that a legal right of hers is at stake to maintain an action, and that alleging mere factual harm or damage is not sufficient.

In fact, we recognized both of these rules in one of this Court's earliest decisions. In *Hendrick v. Cook*, 4 Ga. 241, 263-264 (4) (1848), a riparian-rights case, we rejected the argument that a property owner could not maintain an action against mill owners for causing a stream to overflow onto the property owner's land because he had not proved "perceptible damage." In doing so, we explained that "according to our understanding of the principles of the Common Law, whenever there has been an illegal invasion of the *rights* of another,

28

it is an *injury*, for which he is entitled to a remedy by an action." Id. at 261 (4) (emphasis in original). In other words, the proper inquiry for whether the plaintiff could maintain the action was simply "whether there has been the *violation of a right*." Id. at 264 (4) (emphasis in original) (quoting *Webb*, 29 F. Cas. at 508). "[I]f so, the party injured is entitled to maintain his action for nominal damages, *in vindication of his right*, if no other damages are fit and proper, to remunerate him." Id. (emphasis in original) (quoting *Webb*, 29 F. Cas. At 508). In setting out that test, we acknowledged that "[t]here does exist a class of cases to which the maxim, damnum absque injuria, may properly be applied, but they are not such as where there has been a direct invasion of personal rights, or the rights of property." Id. at 261 (4) (emphasis omitted). In other words, we adopted the common law's rule that, to maintain an action, a plaintiff had to assert the violation of her rights — a legal injury — and not just factual harm or damages.

Over the years leading up to the ratification of our current Constitution in 1983, our decisions continued to recognize and apply

these related rules. As we put it in *SCV*, "what has been deemed essential to invoking the judicial power of Georgia courts is not the nature or extent of a plaintiff's damages, but the violation of a right, as adjudicating these rights is what holds a defendant accountable." *SCV*, 315 Ga. at 52 (2) (b). And in our earlier cases adjudicating either private rights or public rights, plaintiffs have been required, at a minimum, to assert a violation of *their own* legal rights to maintain their actions. See, e.g., *Braswell v. Equitable Mortg. Co.*, 110 Ga. 30, 33 (35 SE 322) (1900) ("As a general rule, no one can be a party to an action if he has no interest in the cause of action."); *City of Rome v. Shropshire*, 112 Ga. 93, 94 (37 SE 168) (1900) (plaintiff had "no right of action" based on the "well-settled principle of law that one who sues for the wrongful damage of property must show title or some interest in himself"); *Mayor and Council of Macon v. Small*, 108 Ga. 309 (34 SE 152) (1899) ("[I]f the plaintiff has no right of action, of course he can have no recovery for any damages he may have suffered; it would be what, under the law, is termed 'damage without injury.'"); *Plumb v. Christie*, 103 Ga. 686, 692 (30 SE 759)

(1898) ("It is a well-settled rule of law that equity will not grant relief to any one who seeks to enjoin that which in nowise affects his rights of person or property. One seeking such relief must show a threatened wrong to himself, an invasion of some legal right, and some interest in preventing a wrong sought to be perpetrated.");

*Nat'l Exch. Bank of Augusta v. Sibley*, 71 Ga. 726, 733-734 (5) (1883) (recognizing "damage without injury" as "perfectly well settled," but applying the common law rule that a plaintiff who could show a violation of his rights was "entitled to maintain his action for nominal damages in vindication of his right").[7]

At common law, the rule that a plaintiff had to assert her own

---

[7] In certain kinds of actions, our earlier decisions required a plaintiff to establish factual harm or damage to maintain the action, but that requirement was in addition to, not a substitute for, asserting an invasion of the plaintiff's legal rights. For instance, just like at common law, "special damage" has long been required to maintain an action for public nuisance. See *Ison v. Manley*, 76 Ga. 804 (1886) (requiring special damage to give a private individual a cause of action for public nuisance); *S. C. R.R. v. Moore & Philport*, 28 Ga. 398, 418 (1859) (stating that "a private action will not lie for a public nuisance" as a general rule, but recognizing an exception when "the party suffered a particular damage"). A similar rule applied to early fraud cases. See, e.g., *Bigby v. Powell*, 25 Ga. 244, 247 (1858) ("[T]o be entitled to the relief sought, the party must show, not only that he was misled and deceived, but that he was endamaged thereby. If no damage resulted from the fraud, he is entitled to no relief.").

legal rights to maintain an action was not described as a "standing" requirement, see *Sierra*, 996 F3d at 1131 (I) (C) (3) (b) (Newsom, J., concurring) (describing this rule at common law as "the question of whether he has a cause of action—whether his legal rights have been infringed and whether the positive law authorizes him to sue for that infringement"), but the earliest decisions of this Court generally treated this rule as a threshold jurisdictional rule. E.g., *Cobb v. Megrath & Patterson*, 36 Ga. 625 (1867); *Henry v. Elder*, 63 Ga. 347, 349 (1879); *Braswell*, 110 Ga. at 33; *Shropshire*, 112 Ga. at 94. And even if our earliest decisions were not always crystal clear about the jurisdictional nature of the rule, we have since recognized, for a long time now, that this requirement reflects a limitation on the judicial power of Georgia courts. The core of the judicial power conferred by the Georgia Constitution has long been described as the power to resolve a controversy about the relative rights and obligations of the parties before it, and to bind those parties to that judgment. See *Se. Greyhound Lines v. Ga. Pub.-Svc. Comm'n*, 181 Ga. 75, 78 (181 SE 834) (1935) ("To adjudicate upon and protect the

32

rights and interests of individual citizens, and to that end to construe and apply the laws, is the peculiar province of the judicial department." (citation and punctuation omitted)); *Gas-Light Co. of Augusta v. West*, 78 Ga. 318, 319 (1886) ("A judicial power extends to deciding, determining controversies which arise between persons and individuals according to law."); *Low v. Towns*, 8 Ga. 360, 368 (1850) (the judiciary is the "legitimate and appropriate" branch to adjudicate the "vested rights of individuals, when acquired under the Constitution and laws of the land"). See also *SCV*, 315 Ga. at 50 (2) (b); *Titshaw v. Geer*, 320 Ga. 128, 141-142 (1) (907 SE2d 835) (2024) (Pinson, J., concurring). This understanding of the judicial power is reflected in our decisions that limit its exercise to "genuine" or "actual" "controversies." *SCV*, 315 Ga. at 50 (2) (b) (citing *Philadelphia Underwriters v. Folds*, 156 Ga. 773, 776 (120 SE 102) (1923); *Gas-Light Co. of Augusta*, 78 Ga. at 319; *Gilbert v. Thomas*, 3 Ga. 575, 579-580 (1847)). See also *Shippen v. Folsom*, 200 Ga. 58, 59 (4) (35 SE2d 915) (1945) (noting that even if the Declaratory Judgment Act did not expressly limit relief to "cases of actual controversy," that

33

"limitation is generally implied and observed by the courts both in America and in England" (citation and punctuation omitted)). And, critical here, our decisions have established that "[f]or an actual controversy to exist, a party must have some right at stake that requires adjudication to protect it." *SCV*, 315 Ga. at 50 (2) (b) (citing *Pilgrim v. First Nat'l Bank of Rome*, 235 Ga. 172, 174 (219 SE2d 135) (1975) (in describing the "actual controversy" requirement in an action for declaratory judgment, stating "as a general rule" that "the parties seeking to maintain the action must have the capacity to sue, and must have a right which is justiciable and subject to a declaration of rights, and it must be brought against an adverse party with an antagonistic interest")); *Braswell*, 110 Ga. at 33; *Brown v. City of Atlanta*, 66 Ga. 71, 76 (1) (1880); *Se. Greyhound Lines*, 181 Ga. at 78-79; *Low*, 8 Ga. at 368. See also, e.g., *Reid v. Town of Eatonton*, 80 Ga. 755 (6 SE 602) (1888) (declining to reach merits of constitutional challenge because the plaintiff failed to assert any injury to his rights); *Plumb*, 103 Ga. 686 (same); *Parker v. Mayor of Savannah*, 216 Ga. 210 (115 SE2d 555) (1960) (same); *Crumley v. Head*, 225 Ga.

34

246 (167 SE2d 651) (1969) (same); *Sims v. State*, 243 Ga. 83 (252 SE2d 501) (1979) (same). In short, as we held in *SCV*, the rule that a plaintiff must assert a violation of her legal rights — a legal injury — to maintain an action "is a standing requirement arising from the Georgia Constitution's Judicial Power Paragraph." *SCV*, 315 Ga. at 62 (2) (c) (iii). See also *Floam*, 319 Ga. at 94 (1).[8]

2. *Third-Party Standing*

Having confirmed that a plaintiff cannot invoke the judicial power of Georgia courts without asserting a violation of her own legal rights as a general matter, we turn to so-called "third-party standing." As we explained above, the federal doctrine of third-party standing allows a plaintiff to maintain an action by asserting that rights of another person who is not a party to the litigation have been violated, as long as he can establish an "injury in fact," a "close

---

[8] In *SCV*, we described this requirement at times as a requirement that the plaintiff assert a "cognizable injury," *SCV*, 315 Ga. at 62 (2) (c) (iii), or a "legal injury," id. at 53-54 (2) (c). Those terms are shorthand for the basic standing rule that we identified there and here — that a plaintiff must assert a violation of her legal rights — and distinct from the Article III standing requirement that a plaintiff must assert an "injury in fact" to sue in federal court.

35

relation to the third party," and some "hindrance to the third party's ability to protect his or her own interests." *Powers*, 499 U.S. at 410-411 (III). Put another way, although the only legal rights in dispute belong to a third party, the plaintiff may bring an action in her own name in federal court to adjudicate those rights if the test for third-party standing is satisfied.

This theory of third-party standing can satisfy federal standing rules in federal court because of the way federal standing doctrine has evolved. For many years, federal standing doctrine looked a lot like Georgia's constitutional standing requirements described above: "it was well-understood, and had been for decades, that a plaintiff could sue only for the violation of a legal right—'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" *Sierra*, 996 F3d at 1117 (I) (B) (Newsom, J., concurring) (quoting *Tenn. Elec. Power Co.*, 306 U.S. at 137-138). See also Henry P. Monaghan, Third Party Standing, 84 Colum. L. Rev. 277, 286 (II) (A) (1984) ("The rule that a litigant has standing to raise only his 'own' rights has a long

history. The early case law contains no suggestion that this limitation was understood to be simply a matter of judicial discretion."). But sometime in the middle of the last century, the United States Supreme Court moved away from that rule, and today, Article III of the United States Constitution (at least as construed by federal courts) does not require a plaintiff to assert a violation of her legal rights to have standing. See id. at 287-289 (II) (A) (tracing the evolution of third-party standing in federal law). See also *Sierra*, 996 F3d at 1117-1118 (I) (B). See generally Sunstein, 91 Mich. L. Rev. at 168-186 (I) (A)-(D). Instead, Article III standing is grounded in a different requirement: an "injury in fact" that is caused by the defendant and redressable by a judicial decision. This injury-in-fact requirement *may* be satisfied by asserting a violation of one's legal rights, at least sometimes. See *Spokeo*, 578 U.S. at 340-341 (II) (B) (1)-(2) (explaining that "intangible harms" can meet the injury-in-fact requirement of Article III, but a plaintiff "could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III"). But it can

also be satisfied by establishing merely real-world harm or damages, like physical or "pocketbook" injury, or property damage. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (II) (A) (144 SCt 1540, 219 LE2d 121) (2024) ("An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples."). That understanding of Article III opened the door to third-party standing. After all, if Article III does not require a plaintiff to assert a violation of legal rights at all, then it does not prevent a plaintiff from bringing a lawsuit asserting *someone else's* legal rights, as long as the plaintiff asserts that the defendant's violation of someone else's legal rights caused the plaintiff an "injury in fact." Understood in this way, federal third-party-standing doctrine imposes requirements beyond the constitutional minimum injury-in-fact and is therefore a prudential, judge-made *limitation* on a federal constitutional standing rule that would otherwise allow expansive third-party standing in federal court. See, e.g., *Craig*, 429 U.S. at 193 (I) (describing third-party standing limits as a "salutary 'rule of

self-restraint,'" not a "constitutional" requirement). Rather than allowing a plaintiff to assert a third party's rights any time a plaintiff can establish an injury in fact, the doctrine says that a party generally must assert her own rights in litigation and allows third-party standing only in those cases in which a plaintiff can meet the doctrine's additional requirements. See id. at 193-194 (I).

This standing landscape in federal courts is different from Georgia's at a fundamental level. The requirement that a plaintiff must assert a violation of her rights to maintain an action in Georgia courts is not a prudential rule subject to judge-made exceptions; it is the bedrock requirement for invoking the judicial power granted by the Georgia Constitution. So, at least on its face, Georgia's law of constitutional standing is not compatible with federal-style third-party standing, which would allow a plaintiff to maintain an action in Georgia courts without meeting the irreducible minimum requirement for doing so: asserting the plaintiff's own legal rights.

And as it turns out, that conclusion is confirmed by this Court's decisions spanning many decades leading up to the ratification of

39

our current Constitution.

In several decisions around the turn of the twentieth century, we rejected attempts by plaintiffs to vindicate legal rights or interests held by nonparties because they had asserted no legal right of their own that would have been sufficient to maintain the action. In *Reid v. Town of Eatonton*, for example, this Court refused to decide the merits of a white plaintiff's claim that a town's bond sale unconstitutionally discriminated against black residents, because he did not allege that any of his own rights were affected by the bond sale. See 80 Ga. at 757 (1) ("A court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has, therefore, no interest in defeating it." (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 197 (5th ed. 1883)) (punctuation omitted)). We applied *Reid*'s rule a few years later in *Braswell v. Equitable Mortg. Co.*, where we dismissed an estate administrator's challenge on appeal to the validity of a deed held by a mortgage company after the estate

40

had sold the property in dispute. See *Braswell*, 110 Ga. at 30-33. Although the validity of the deed's conveyance "might probably be a material question affecting the rights of the purchasers," we were "wholly unable to ascertain" any interest of the administrator or the estate he represented, so we dismissed the writ of error "[w]ithout . . . passing on the question made in the record." Id. And in three different property-rights cases decided around the same time, we held that the plaintiffs in each could not maintain their actions after it turned out that nonparties held the property rights in dispute. See *Shropshire*, 112 Ga. at 93-95 (title to property actually belonged to plaintiff's wife); *Mitchell v. Ga. & Ala. Ry. Co.*, 111 Ga. 760, 761, 771 (2) (36 SE 971) (1900) (same); *Lockhart v. W. & AH. R.R.*, 73 Ga. 472, 473-474 (1884) (plaintiff's brother was true owner of a painting and so was the person who could maintain an action to seek a remedy for the violation of his property rights). In each decision, we applied the same rule: the action had to be brought in the name of the party that held the right or interest in the property that was damaged or in dispute, and if the plaintiff had no such rights, he could not maintain

41

the action. See also *Palmour v. Durham Fertilizer Co.*, 97 Ga. 244, 244 (22 SE 931) (1895) ("If the plaintiff in such action fails to show title in himself, he cannot recover either the property sued for or its value in money."); *Jones v. Watson*, 63 Ga. 679 (1879); *Wallis v. Osteen*, 38 Ga. 250 (1868); *Brooking v. Dearmond*, 27 Ga. 58, 62-63 (1859).

After this Court's string of consistent decisions establishing this rule against bringing actions to vindicate the rights of nonparties, the Court of Appeals was created, and it correctly applied this "well settled" rule for decades, mostly in the context of property-based actions. See, e.g., *S. Ry. Co. v. Strozier & Waters*, 10 Ga. App. 157, 158 (73 SE 42) (1911) (citing *Mitchell*, 111 Ga. at 760); *Dobbs v. Bell Laundry*, 25 Ga. App. 734, 734-735 (105 SE 53) (1920) (plaintiff who was an agent of property's true owner could not maintain an action); *Paschal v. Godley*, 34 Ga. App. 321, 322 (129 SE 565) (1925) (same); *Andrew v. George Muse Clothing Co.*, 44 Ga. App. 291, 292 (161 SE 296) (1931) (same); *Eibel v. Mechs. Loan & Sav. Co.*, 52 Ga. App. 349, 351 (183 SE 133) (1935) (legal title had passed to vendee,

vendor could not sue based on equitable title alone); *Tidwell v. Bush*,

59 Ga. App. 471, 471 (1 SE2d 457) (1939); *Smith v. State Farm Mut.*

*Auto. Ins. Co.*, 89 Ga. App. 292, 292 (79 SE2d 7) (1953); *Dayton Rub-*

*ber Co. v. Dismuke*, 102 Ga. App. 85, 88-89 (115 SE2d 767) (1960).[9]

As the century marched on, this Court continued to apply the

---

[9] It is also worth noting in this regard that the basic rule that a plaintiff must assert her own rights to maintain an action has been codified in certain contexts. See, e.g., OCGA § 9-2-21 (a) ("An action for a tort shall, in general, be brought in the name of the person whose legal right has been affected. In the case of an injury to property, a tort action shall be brought in the name of the person who was legally interested in the property at the time the injury thereto was committed or in the name of his assignee."); OCGA § 9-2-20 (a) ("As a general rule, an action on a contract, whether the contract is expressed, implied, by parol, under seal, or of record, shall be brought in the name of the party in whom the legal interest in the contract is vested."). Arguments that a plaintiff has not asserted her own rights in an action have been litigated regularly under those statutory provisions. See, e.g., *Patellis v. Tanner*, 199 Ga. 304, 314 (3) (34 SE2d 84) (1945) (relying on predecessor to OCGA § 9-2-21); *Tyler v. Nat'l Life & Accident Ins. Co.*, 48 Ga. App. 338, 340 (172 SE 747) (1934) (relying on predecessor to OCGA § 9-2-20).

The Civil Practice Act's requirement that "[e]very action shall be prosecuted in the name of the real party in interest," OCGA § 9-11-17 (a), which was enacted in 1966, see Ga. L. 1966, pp. 609, 629, § 17, can also overlap with the basic standing rule. See, e.g., *Equitable Life Assurance Soc'y of U. S. v. Tinsley Mill Vill.*, 249 Ga. 769, 771-772 (2) (294 SE2d 495) (1982) (condominium association was not the real party in interest where "the rights sought to be enforced are the right to recover for damages to property and the right to have that property protected against the continuance of a nuisance," and "[t]hose rights belong to the owners of the property damaged — the condominium owners," not the association that allegedly "represent[ed]" them).

43

basic rule underlying our consistent rejection of attempts to assert the rights of third parties — that a plaintiff must assert her own rights to maintain an action — in other contexts. Many of those decisions involved constitutional challenges to statutes, and in those decisions, we consistently applied *Reid*'s rule that a plaintiff could not challenge a statute on constitutional grounds unless he could "show that its enforcement is an infringement upon his right of person or property, and that such infringement results from the unconstitutional feature of the statute upon which he bases his attack." *S. Ga. Nat. Gas Co. v. Ga. Pub. Serv. Comm'n*, 214 Ga. 174, 175 (1) (104 SE2d 97) (1958) (citing *Reid*, 80 Ga. 755). See also, e.g., *Plumb*, 103 Ga. at 692; *Parker*, 216 Ga. at 215 (6); *Ne. Factor & Disc. Co., Inc. v. Jackson*, 223 Ga. 709, 710 (1) (157 SE2d 731) (1967); *Crumley*, 225 Ga. at 247 (3); *Bryant v. Prior Tire Co.*, 230 Ga. 137, 138 (196 SE2d 14) (1973); *Reinertsen v. Porter*, 242 Ga. 624, 630 (2) (250 SE2d 475) (1978); *Iteld v. Silverboard*, 247 Ga. 158, 158-159 (1) (275 SE2d 645) (1981); *Smith v. State*, 248 Ga. 828, 830 (2) (286 SE2d 709) (1982). These decisions were also clear that the minimum requirement for

standing to bring constitutional challenges was not a showing of the federal-style injury-in-fact, but an assertion that the plaintiff's own *rights* were violated. See *S. Ga. Nat. Gas Co.*, 214 Ga. at 175 (1) ("He must show that the alleged unconstitutional feature of the statute injures him, *and so operates as to deprive him of rights* protected by the Constitution of this State or by the Constitution of the United States, or by both." (emphasis added)).[10] This rule was applied on appeal, too, just as it had been in *Braswell*: we continued to hold that an appellant lacks standing to appeal without asserting that the judgment below affected her own rights. See, e.g., *Cooper Motor*

---

[10] As we have noted before, when this standing rule has been applied in the context of constitutional challenges to statutes, we have required the plaintiff to assert an individualized injury. See *Floam*, 319 Ga. at 92 (1); *SCV*, 315 Ga. at 54 (2) (c) n.13. This language in part reflects the basic rule that a plaintiff must assert her own legal rights. See, e.g., *S. Ga. Nat. Gas Co.*, 214 Ga. at 175 (1). And that rule, as we have discussed, is a constitutional rule that reflects a limitation on the judicial power. Beyond this basic standing rule, these decisions appear to impose an additional requirement, rooted in separation of powers principles, that the plaintiff challenging the constitutionality of a statute must *also* assert a private right. See *Floam*, 319 Ga. at 92 (1) (citing, e.g., *Bd. of Educ. of Glynn County v. Mayor of Brunswick*, 72 Ga. 353, 354-355 (1884); *Scoville v. Calhoun*, 76 Ga. 263, 269 (1886)). In other words, to challenge the constitutionality of a state statute, it is generally not sufficient to assert only the generalized violation of a *public* right, which is by definition not individualized, at least absent a right of action granted by the legislature for vindicating the public right at issue.

*Lines, Inc. v. B. C. Truck Lines, Inc.*, 215 Ga. 195, 195 (2) (109 SE2d 689) (1959) (appellant had no right to appeal because the judgment below did not affect appellant's rights); *Bryan v. Rowland*, 166 Ga. 719, 724 (144 SE 275) (1928) (appellant administrator for an estate was "without legal right" to appeal because the parties in the court below (all the heirs to the estate) had not appealed and the administrator had no rights of his own at stake). So, although our Court did not have occasion to reject further attempts to assert the rights of nonparties after our earlier string of decisions doing so, the throughline of the basic requirement that animated those decisions continued right up until our current Constitution was ratified.

In sum, neither the common law nor our body of decisional law that followed leaves room for a theory of standing like the federal doctrine of third-party standing to properly invoke the judicial power of Georgia courts. To the contrary, our decisions reflect a consistent understanding that a plaintiff must assert her own legal rights to have a Georgia court resolve a dispute about the relative rights of the parties to an action, and we have consistently rejected

46

plaintiffs' attempts to have our courts adjudicate the rights of (and much less bind) parties not before the court.[11] All of this leads us to conclude that our current Constitution's grant of the judicial power to Georgia courts does not include the power to adjudicate a plaintiff's claim asserting only the rights of parties not before the Court. Put simply, Georgia's rules of constitutional standing are not

---

[11] This Court has before characterized a couple of our decisions as allowing some version of standing to assert the rights of others: *Agan v. State of Ga.*, 272 Ga. 540 (533 SE2d 60) (2000) and *Ambles v. State*, 259 Ga. 406 (383 SE2d 555) (1989). See *Burgess*, 282 Ga. at 434 (1). That characterization was mistaken. In *Agan*, the plaintiff, a convicted felon, challenged the constitutionality of a law that required revocation of certain businesses' licenses if an employee or agent was a convicted felon. The plaintiff had standing because he asserted that enforcing the statute against him violated his *own* rights under the Ex Post Facto Clauses of the Georgia and United States Constitutions (and he also had constitutional-challenge standing, we held, because enforcing the law could "mak[e] it impossible for him to work or operate in the industry" or gain an ownership stake in a lending institution covered by the law). *Agan*, 272 Ga. at 542 (1). And *Ambles* was not a decision about constitutional standing to invoke the judicial power. The State plainly had constitutional standing to invoke the judicial power in that case, because the case was a criminal prosecution. See *SCV*, 315 Ga. at 54 (2) (c) ("Because the public is harmed, the State, as the sovereign, is the proper party to prosecute crimes."). The question instead was whether the State had *constitutional-challenge* standing to argue that certain statutes governing witness competency violated the Equal Protection Clause of the United States Constitution. *Ambles*, 259 Ga. at 406 (1). *Ambles*'s holding that the State had that separate kind of standing is subject to question, see *Williams*, 320 Ga. at 233 (Peterson, P. J., concurring), but it is not a holding that a plaintiff has constitutional standing to invoke the judicial power by asserting only the rights of others. So we disapprove our language in *Burgess* that characterized those decisions as third-party-standing decisions.

47

compatible with the federal doctrine of third-party standing.

B. *Stare Decisis*

Given this conclusion, we must consider stare decisis. As we just determined, properly understood, the judicial power of our courts may not be invoked by a plaintiff who seeks to maintain an action by asserting only the rights of a nonparty, as the federal doctrine of third-party standing would allow. Indeed, the parties and the Attorney General appearing as an amicus here agree on that much. Even Wasserman has now acknowledged in briefing to this Court that a plaintiff must show a "violation of his or her own rights" to establish standing in Georgia courts. Nonetheless, this Court uncritically imported the federal doctrine of third-party standing in 2007, see *Burgess*, 282 Ga. at 434-436 (1), well after our current Constitution was ratified. So we must decide whether principles of stare decisis compel us to retain the precedent that borrowed the federal doctrine.

1. *Principles of Stare Decisis*

When we consider whether to follow one of our past decisions,

48

stare decisis is the "strong default rule." *Johnson v. State*, 315 Ga. 876, 887 (3) (885 SE2d 725) (2023). Ours is a system of precedent, built on the premise, if not a promise, that future cases will be decided like similar past cases. See *Ammons*, 315 Ga. at 169 (1) (Pinson, J., concurring); Bryan A. Garner, The Law of Judicial Precedent 12 (1st ed. 2016). Sticking to our precedent promotes a system of equal treatment under the law rather than one of "arbitrary discretion." *Ammons*, 315 Ga. at 169 (1) (Pinson, J., concurring) (quoting The Federalist No. 78, at 529 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)). See also *Olevik v. State*, 302 Ga. 228, 244-245 (2) (c) (iv) (806 SE2d 505) (2017). Such a system not only yields a body of law that is more stable, predictable, and reliable: it is also the only kind of system that is consistent with the rule of law.

"In rare cases, however, following a past decision would do more harm to the rule of law than overruling it would." *Johnson*, 315 Ga. at 887 (3). See also, e.g., *Ellison v. Ga. R.R. & Banking Co.*, 87 Ga. 691, 696 (13 SE 809) (1891) (explaining that stare decisis preserves "[m]inor errors, even if quite obvious, or important errors, if

their existence be fairly doubtful," but "the only treatment for a great and glaring error affecting the current administration of justice . . . is to correct it"). In identifying those "rare cases," we have resisted applying a strict formula or an "exclusive" list of "factors." *Johnson*, 315 Ga. at 887-888 (3). But when we have considered stare decisis, we have paid attention to features of the precedent at issue that bear on whether it would be more harmful to leave the question at issue "decided" or have it "decided right." *Olevik*, 302 Ga. at 245 (2) (c) (iv) (citation, punctuation and emphasis omitted).

Some of those features bear quite directly on rule-of-law concerns. As a threshold matter, precedents that are not just wrong but "unreasoned," or which "disregard[ ] the basic legal principles that courts use to do law," are ripe for overruling. *Floam*, 319 Ga. at 94 (1) n.5 (quoting *Ammons*, 315 Ga. at 171-172 (1)). See also, e.g., *State v. Jackson*, 287 Ga. 646, 653 (3) (697 SE2d 757) (2010); *Gilliam v. State*, 312 Ga. 60, 63 (860 SE2d 543) (2021); *State v. Hudson*, 293 Ga. 656, 661-662 (748 SE2d 910) (2013); *Nalls v. State*, 304 Ga. 168, 179 (3) (b) (815 SE2d 38) (2018). Such precedents embody just the

sort of "arbitrary discretion" (whether actual or apparent) that can be especially harmful to the rule of law, see The Federalist No. 78, at 529 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), so we are more open to replacing them with (ideally) carefully reasoned rules of decision that courts can apply evenhandedly to future cases. A similar explanation best justifies reconsidering precedents that are truly "unworkable": precedents that leave courts without manageable standards to cabin judicial discretion and invite courts to make policy decisions instead of doing law. See, e.g., *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (II) (105 SCt 1005, 83 LE2d 1016) (1985) (overruling as "unsound in principle and unworkable in practice" a rule of state immunity that "inevitably invite[d] an unelected federal judiciary to make decisions about which state policies it favors and which ones it dislikes"); *Cook v. State*, 313 Ga. 471, 496 (3) (d) (870 SE2d 758) (2022) (describing as an "aspect of this workability problem" that "the lines we have drawn" in the line of precedent in question were "often based on considerations of policy rather than law"). See also Michael Stokes Paulsen, Does the Supreme

Court's Current Doctrine of Stare Decisis Require Adherence to the Supreme Court's Current Doctrine of Stare Decisis?, 86 N.C. L. Rev. 1165, 1173-1177 (I) (B) (1) (2008).[12] In a similar vein, we have been less inclined to preserve holdings that conflict with — or as we have put it in various decisions, are a "departure from," "dissonan[t] with," "inconsistent with," "contrary to," or an "aberration in" — precedent in the same area, because keeping such decisions can undermine rather than promote a system of equal treatment under the law. *Green v. State*, 318 Ga. 610, 635 (II) (C) (898 SE2d 500) (2024); *Pounds v. State*, 309 Ga. 376, 382 (3) (846 SE2d 48) (2020), overruled on other grounds by *Johnson*, 315 Ga. at 889 (3) & n.11; *Jackson*, 287 Ga. at 658 (5); *Grissom v. Gleason*, 262 Ga. 374, 376 (2) (418 SE2d 27) (1992). Finally, we have been more willing to correct past decisions that are clearly wrong about the jurisdiction of Georgia

---

[12] Some of us have criticized "workability" as a factor in the analysis of stare decisis because it proves quite malleable in practice. See *Johnson*, 315 Ga. at 888-889 (3); *Ammons*, 315 Ga. at 173 (2) n.21 (Pinson, J., concurring). But properly applied, this narrow understanding of workability as a question about whether the legal rule in question is susceptible of principled judicial administration or simply a vehicle for unbounded discretion is consistent with the principles that animate stare decisis.

courts, especially when they bend or break the limits that the people of Georgia and our elected representatives have placed on our power as courts to hear cases. See, e.g., *Gilliam*, 312 Ga. at 63; *Pounds*, 309 Ga. at 381-382 (3); *Duke v. State*, 306 Ga. 171, 182-183 (3) (c), 186-187 (4) (829 SE2d 348) (2019); *Cook*, 313 Ga. at 479 (2) (a), 506 (5). See also *Buckner-Webb*, 314 Ga. at 836-837 (2) (Pinson, J., concurring) ("It is an especially troubling kind of error to arrogate to ourselves as appellate courts the authority to bend the limits of our own power to review cases.").

In addition to those concerns driven by respect for the rule of law, we have considered a limited set of more practical consequences when applying stare decisis. First, we have long considered so-called "reliance interests": at the least, when parties have long relied on a legal rule in making decisions affecting property or contract rights, courts are especially hesitant to unsettle precedents that could disrupt or destroy such thought-to-be-settled rights. *Olevik*, 302 Ga. at 245 (2) (c) (iv). See, e.g., *Leary v. Durham*, 4 Ga. 593, 600-601 (1848) (in applying stare decisis to preserve a precedent, explaining that

53

"in questions of property *certainty* is of incalculable importance").[13] Second, although the age of a precedent by itself is a poor gauge of whether it should be retained, a legal rule might be so "deeply entrenched" in the body of law that trying to dig it out would do more harm than good. *Frett v. State Farm Emp. Workers' Comp.*, 309 Ga. 44, 60 (3) (c) (844 SE2d 749) (2020). See also *Cook*, 313 Ga. at 510-511 (1) (Peterson, J., dissenting). Third, we have "typically applied stare decisis with less force" to precedents that interpret a constitutional provision than to precedents that interpret statutes, reasoning that it is harder as a practical matter for the people to correct constitutional precedents. *Floam*, 319 Ga. at 94 (1) n.5.

These considerations are guideposts, not a mechanical formula or a multi-factor test. At bottom, the question whether to overrule a precedent comes down to whether getting the law right is worth the cost to the rule of law of unsettling what had been settled. See *Olevik*, 302 Ga. at 245 (2) (c) (iv). For the overwhelming majority of

---

[13] This Court has focused principally on reliance interests in connection with property or contract rights. See, e.g., *Olevik*, 302 Ga. at 245 (2) (c) (iv); *Savage v. State of Ga.*, 297 Ga. 627, 641 (5) (b) (774 SE2d 624) (2015).

precedents, the juice is not worth the squeeze. But in rare cases —

when a precedent is not just wrong, but "obviously and harmfully"

so — stare decisis is not a bar to getting the law right. *Johnson*, 315

Ga. at 877.

2. *Application of Stare Decisis*

For a number of reasons, this Court's precedent that adopted

the federal doctrine of third-party standing is one of those rare cases.

As a threshold matter, decisions that uncritically import into

Georgia law holdings of federal courts about federal law fall into the

category of unreasoned and arbitrary decisions that we have been

more willing to reconsider. See *Ammons*, 315 Ga. at 171-172 (1).

Such federal-law holdings might be consistent with Georgia law, or

they might not. But importing them without even checking first (at

the least, taking a stab at interpreting the relevant language of

Georgia law and showing our work) is little better than picking a

rule out of a hat. See *Buckner-Webb*, 314 Ga. at 834 (1). And that

arbitrary approach is a far cry from the kind of "actual legal reason-

ing" that, consistent with the rule of law, courts are expected to do.

*Floam*, 319 Ga. at 94 (1) n.5. So here. See *Burgess*, 282 Ga. at 434-435 (1) ("adopt[ing]" federal doctrine of third-party standing whole-sale without any analysis of Georgia law because "[i]t is well estab-lished under federal law" and other states had allowed standing in similar cases).

This Court's uncritical adoption of federal third-party standing is made worse by its especially poor fit with the body of Georgia law. As explained above, that doctrine is not compatible with Georgia's well-settled constitutional standing rule that a plaintiff must assert her own rights to maintain an action. That bedrock limit on the ju-dicial power, which is rooted in the common law and cemented in an unbroken line of precedent leading up to the ratification of our cur-rent Constitution, would be ignored every time a court allowed a plaintiff without any right at stake to assert the rights of a party not before the court. Call that what you will — a "departure from," "in-consistent" or "dissonant with," "contrary to," or an "aberration in" our law of constitutional standing — it is not a state of affairs that ought to persist in a system that is supposed to treat like cases alike.

This third-party standing precedent is the kind of precedent we are more willing to reconsider in other ways, too. It is an error that wrongly expands our own power to hear cases, compare, e.g., *Gilliam*, 312 Ga. at 63 (overruling decision that took jurisdiction over certain appeals for "judicial economy," "ignor[ing] the constitutional parameters of [the Court's] jurisdiction without any significant analysis"), and on constitutional grounds, compare, e.g., id. at 61, 63; *Floam*, 319 Ga. at 94 (1) n.5; *Olevik*, 302 Ga. at 245 (2) (c) (iv). And although this doctrine is not "unworkable" to a degree that would justify overruling for that reason alone, a multifactor test that asks about "close[ness]" to the third party and whether that non-party faces a sufficient "hindrance," see *Burgess*, 282 Ga. at 435 (1), is far more susceptible to arbitrary application than the clear and time-tested rule that a party must assert her own rights to maintain an action.

Finally, none of the practical consequences this Court has considered cut in favor of preserving this federal doctrine as part of Georgia law. No party has identified (nor are we aware of) any

reliance interests in preserving the doctrine, much less any basis to think discarding it would affect settled property or contract rights. Compare *Johnson*, 315 Ga. at 888 (3) ("[S]tare decisis applies with less force to a judge-made rule that governs only 'internal Judicial Branch operations' and so does not affect parties' out-of-court affairs." (citation omitted)). And the doctrine is far from "entrenched": this Court imported it 18 years ago, compare, e.g., *Southall v. State*, 300 Ga. 462, 463, 468 (1) (796 SE2d 261) (2017) (overruling 45-year-old precedent); *Hudson*, 293 Ga. at 656, 662 (overruling 38-year-old precedent), and since then, only a handful of reported appellate decisions have applied the federal-third-party-standing test. Hardly a legal cornerstone.

For all these reasons, stare decisis does not spare the federal doctrine of third-party standing that we uncritically imported in *Burgess*. So we overrule that decision's adoption of the federal doctrine of third-party standing and the handful of later decisions to the extent they hold that a plaintiff may rely on the federal doctrine

of third-party standing to maintain an action in Georgia courts.[14]

\*

Now that the federal doctrine of third-party standing is no longer a part of Georgia's law of constitutional standing, a plaintiff may not maintain an action in Georgia courts by asserting only the rights of a third party and meeting the elements of the federal test. Instead, at a minimum, a plaintiff must assert her own rights to maintain an action in Georgia courts.[15]

---

[14] Those decisions include *Bishop v. Patton*, 288 Ga. 600, 603 (2) (706 SE2d 634) (2011); *Ferguson v. Perry*, 292 Ga. 666, 674 (3) (740 SE2d 598) (2013); *Payton v. City of College Park*, 368 Ga. App. 396, 398-399 (2) (890 SE2d 278) (2023); and *Doe v. Broady*, 369 Ga. App. 493, 497 n.5 (893 SE2d 857) (2023).

This case does not present, but would seem to control, the closely related question whether the federal doctrine of associational standing is properly a part of Georgia law. Like federal third-party standing, that doctrine was uncritically imported into Georgia law after the ratification of our current Constitution. See *Aldridge v. Ga. Hosp. & Travel Ass'n*, 251 Ga. 234, 235-236 (1) (304 SE2d 708) (1983). And like federal third-party standing, federal associational standing allows an association to assert the rights of people who are not before the court (the association's members) without asserting that the association's own rights are at stake. See id. Given that the same reasons that require us to excise federal third-party standing from Georgia law would seem to apply to federal associational standing, it is doubtful that it can properly remain a part of Georgia law. But the plaintiff here does not assert associational standing, so we must leave the question of that doctrine's continued vitality for another day.

[15] Our conclusion that federal third-party standing is not properly a part of Georgia law should not be understood to call into question plaintiffs' standing under traditional doctrines like "next friend" standing or in qui tam

III. *Application*

Wasserman does not appear to dispute our basic conclusions about the nature of our constitutional standing requirements. Instead, Wasserman raises arguments that she still has standing to assert Pham's federal equal protection rights in Georgia courts. First, relying on the Supremacy Clause of the United States Constitution, Wasserman contends that Georgia's constitutional standing requirements are either unconstitutional or preempted to the extent that their application would prevent her from having her federal claim under 42 USC § 1983 adjudicated in state court. Second, she contends that even if our constitutional standing requirements apply to her claim, she has satisfied those requirements because Pham "assigned" his rights under the application for a conditional use

---

actions. In those kinds of actions, the party that is "represented" by the next friend or relator, respectively, is understood to be a party to the case, not a third party whose right a plaintiff seeks to vindicate without any legal authority for doing so. See, e.g., *Lasseter v. Simpson*, 78 Ga. 61, 65 (3 SE 243) (1886); *Dent v. Merriam*, 113 Ga. 83 (38 SE 334) (1901); OCGA § 23-3-122 (b) (1). To the extent that qui tam relators are asserting a public right, they might also rely on the community-stakeholder standing that we recognized in *SCV*. Cf. *SCV*, 315 Ga. at 53-54 (2) (b)-(c). In all events, given those doctrines' deep roots in both the common law and Georgia law, there is little doubt that the judicial power of Georgia courts would properly extend to those kinds of cases.

permit to her. We address each argument in turn.

A. *Supremacy Clause*

In our federalist system, the States "have great latitude to establish the structure and jurisdiction of their own courts." *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 372 (III) (3) (110 SCt 2430, 110 LE2d 332) (1990). So "[t]he general rule, 'bottomed deeply in belief in the importance of state control of state judicial procedure, is that federal law takes the state courts as it finds them.'" Id. That said, a state may not simply decline to recognize federal law, including federal causes of action like the one provided by 42 USC § 1983. After all, "[t]he laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are." Id. at 367 (III) (punctuation omitted). And "the Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source." Id. at 371 (III) (2).

The United States Supreme Court has applied these principles in a line of decisions addressing challenges under the Supremacy

Clause to state court decisions declining to reach the merits of federal claims. In that line of decisions, the Court has drawn a line between two kinds of state-court rules. A rule that targets or discriminates against a federal cause of action or is "used as a device to undermine federal law" violates the Supremacy Clause. *Haywood v. Drown*, 556 U.S. 729, 739 (IV) (129 SCt 2108, 173 LE2d 920) (2009). See also *Howlett*, 496 U.S. at 381 (V). On the other side of the line, a "neutral jurisdictional rule" — that is, a rule that "reflect[s] the concerns of power over the person and competence over the subject matter that jurisdictional rules are designed to protect" — can properly bar the claim of a plaintiff who fails to comply with the neutral rule. *Haywood*, 556 U.S. at 735 (III), 739 (IV) (quoting *Howlett*, 496 U.S. 356). See also, e.g., *Douglas v. N.Y., New Haven & Hartford R.R. Co.*, 279 U.S. 377 (49 SCt 355, 73 LE 747) (1929) (upholding state discretionary rule allowing state courts to decline jurisdiction over cases when neither party was a state resident); *Herb v. Pitcairn*, 324 U.S. 117 (65 SCt 459, 89 LE 789) (1945) (upholding state rule of territorial jurisdiction); *Mo. ex rel. S. Ry. Co. v.*

*Mayfield*, 340 U.S. 1 (71 SCt 1, 95 LE 3) (1950) (upholding state forum non conveniens rule); *Johnson v. Fankell*, 520 U.S. 911 (117 SCt 1800, 138 LE2d 108) (1997) (upholding state rule prohibiting interlocutory appeals).

Georgia's constitutional standing requirements are the second kind of rule. As we explained above, the constitutional rule that a plaintiff must assert her own rights to maintain an action has long been understood as a limitation on the judicial power of our courts. See *SCV*, 315 Ga. at 44 (2) (a), 50 (2) (b). And unlike the state rules that the Supreme Court has found wanting in its Supremacy Clause decisions, there is no serious argument that this constitutional standing rule targets or discriminates against federal rights or causes of action in any way. If a plaintiff brings a claim in Georgia courts asserting only the rights of a nonparty, a Georgia court lacks the power to adjudicate that claim, regardless of whether the rights asserted or the cause of action come from state or federal law. Compare *Haywood*, 556 U.S. at 739, 741-742 (IV) (deeming "unconstitutional" a "unique scheme adopted by the State of New York" that

63

shielded correction officers from damages claims brought by prisoners "[b]ased on the belief that damages suits against correction officers are frivolous and vexatious" because it was "effectively an immunity statute cloaked in jurisdictional garb" that was "used as a device to undermine federal law"); *Howlett*, 496 U.S. at 375, 379-380 (IV) (state court's decision extending sovereign immunity to bar "one discrete category of § 1983 claims" "violate[d] the Supremacy Clause" because it discriminated against certain federal actions for constitutional violations and could be "based only on the rationale that [state officials] should not be held liable for § 1983 violations in the courts of the State"); *Felder v. Casey*, 487 U.S. 131, 138 (II) (A) (108 SCt 2302, 101 LE2d 123) (1988) (state statute requiring a notice of claim to be filed in Section 1983 cases in state courts preempted by federal law) (superseded in part by statute on other grounds). Wasserman offers no argument to the contrary, or any suggestion as to how a neutral standing requirement that a plaintiff must assert her own rights to maintain an action works in any way

to discriminate against or undermine federal law.[16] And indeed, any such argument would be hard to square with the language of 42 USC § 1983, which itself gives a plaintiff a right of action only against a person who under color of state law "depriv[es]" the plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws," and makes the defendant liable only "to the party injured." In other words, with respect to claims under 42 USC § 1983, our constitutional standing rule does nothing more than require that the person who has the "right of action" under that statute — someone who has asserted that she has been "deprived" of her federal rights — is the person who brings that claim in court. In short, Georgia's constitutional standing requirements are neutral jurisdictional rules of the sort that state courts may apply evenhandedly to federal claims without running aground on the Supremacy Clause. So

---

[16] Wasserman cites an Oregon Supreme Court decision that held that Oregon's "standards of mootness and justiciability" were not "jurisdictional rules" that could be applied to bar a Section 1983 claim because those standards did not reflect concerns about the power of their courts over the person or competence over the subject matter. *Barcik v. Kubiaczyk*, 321 Or. 174, 184 (895 P2d 765) (1995). But a decision interpreting Oregon law has no bearing on whether Georgia's constitutional standing requirements are jurisdictional rules that concern the power of Georgia courts to resolve disputes.

Wasserman's argument that we cannot apply Georgia's law of constitutional standing fails.

B. *Constitutional Standing*

In a supplemental brief filed after oral argument at this Court's request, Wasserman contended that she has constitutional standing to assert Pham's equal protection rights as her own because he assigned any such claim to her in an agreement that assigned Wasserman his "rights under the Application" for the conditional use permit.[17] Although our holding today does not disturb existing Georgia law on asserting assigned claims, see, e.g., OCGA § 44-12-24; OCGA § 13-8-2 (a) (5), the County raised threshold questions in response to Wasserman's supplemental brief about whether a federal equal

---

[17] At oral argument, Wasserman advanced a different theory: she contended that she has community-stakeholder standing because the county violated a public right by violating Pham's federal equal protection rights. She later disavowed that novel argument in her supplemental brief, so we need not resolve it. That said, we are not aware of any authority for the idea that a plaintiff may assert a government's violation of another person's individual constitutional rights — that is, a violation of a third party's private rights — as a violation of "public rights" also shared by the plaintiff. Nor are we aware of any right of action that would allow a plaintiff to vindicate that novel theory. See *SCV*, 315 Ga. at 63-64 (2) (d) (noting separate threshold requirement, in addition to standing, that a plaintiff must have a right of action (sometimes called "statutory standing") to sue).

protection claim belonging to Pham was assignable and in fact assigned to Wasserman, such that she could assert Pham's equal protection rights as her own. Because Wasserman proceeded under a theory of third-party standing below, these arguments and questions were neither raised nor addressed below nor presented to this Court for review. We are a court of review, not of first view, see *Efficiency Lodge, Inc. v. Neason*, 316 Ga. 551, 567 (3) (889 SE2d 789) (2023), so we leave it to the courts below to resolve these questions in the first instance if Wasserman continues to press her assignment argument on remand.

*Judgment vacated and case remanded with direction. All the Justices concur.*

Decided January 28, 2025.

Certiorari to the Court of Appeals of Georgia — 367 Ga. App. 694.

*George E. Butler II*, for appellant.

*Buckley Christopher & Hensel, Timothy J. Buckley III, Eric J. O'Brien*, for appellee.

*Christopher M. Carr, Attorney General, Stephen J. Petrany, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General*, amici curiae.